The Hon. James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br><br>                    Plaintiff,<br><br>    v.<br><br>KAREN ULBRICHT, et al.,<br><br><br><br>                    Defendants. | No. 2:20-cv-0369-JLR<br><br>**DECLARATION OF ALEXANDER E. ACKEL IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE USFG'S EXPERT CLAIMS-HANDLING EXPERT, ALLAN D. WINDT, J.D.**<br><br>**NOTED FOR HEARING: DECEMBER 3, 2021** |
| KAREN ULBRICHT, et al.,<br><br>                    Plaintiff,<br><br>    v.<br><br>UNITED STATES FIDELITY AND GUARANTY COMPANY,<br><br>                    Defendant. | |
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br><br>                    Plaintiff,<br><br>    v.<br><br>ALLIANZ INSURANCE COMPANY, et al.<br><br>                    Third-Party Defendants. | |

DECLARATION OF ALEXANDER E. ACKEL
USF&G Co. v. Karen Ulbricht, et al., Case No. 20-cv-0369-JLR
Page 1 of 3

**FRIEDMAN | RUBIN® PLLP**
1109 FIRST AVENUE, STE 501
SEATTLE, WA 98101
(206) 501-4446

ALEXANDER E. ACKEL declares:

1.      I am one of the attorneys of record for the Ulbricht Defendants and PM Northwest, Inc.; am over the age of 18 years; make this declaration based upon personal knowledge; and am competent to testify to the facts herein.

2.      Attached hereto as **Exhibit A** is a complete and accurate copy of Allan D. Windt's Curriculum Vitae.

3.      Attached hereto as **Exhibit B** is a complete and accurate copy of Allan D. Windt's Expert Report disclosed in this matter.

4.      Attached hereto as **Exhibit C is** a complete and accurate copy of Allan D. Windt's Rebuttal Expert Report disclosed in this matter.

5.      Attached hereto as **Exhibit D is** a complete and accurate copy of Charles M. Miller's Expert Report disclosed in this matter.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. Executed on November 16, 2021, at Seattle, Washington.

_____
Alexander E. Ackel, WSBA #52073

DECLARATION OF ALEXANDER E. ACKEL
USF&G Co. v. Karen Ulbricht, et al., Case No. 20-cv-0369-JLR
Page 2 of 3

**FRIEDMAN | RUBIN® PLLP**
1109 FIRST AVENUE, STE 501
SEATTLE, WA 98101
(206) 501-4446

1

2

**CERTIFICATE OF SERVICE**

3

      I hereby certify that on November 16, 2021, I electronically filed the foregoing document

4

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

5

to all counsel of record.

6

7

8

9                              *s/Nori Skretta*
                          Nori Skretta, Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALEXANDER E. ACKEL
USF&G Co. v. Karen Ulbricht, et al., Case No. 20-cv-0369-JLR
Page 3 of 3

**FRIEDMAN | RUBIN® PLLP**
1109 FIRST AVENUE, STE 501
SEATTLE, WA 98101
(206) 501-4446

# Exhibit A

## CURRICULUM VITAE

**NAME:**      Allan D. Windt

## BUSINESS ADDRESS

Allan D. Windt
187 Hummock Pond Road
Nantucket, MA 02554
508-325-4899
Allanwindt@verizon.net

## EDUCATION:

Duke Law School               Sept. '73 - June '76
Graduated First in Class

## PUBLICATIONS:

Insurance Claims & Disputes, Representation of Insurers and
Insureds, West, 1982 first edition, 1988 second edition, 1995 third edition,
2001 fourth edition, 2007 fifth edition, 2013 sixth edition, 2021 supplement.

## LECTURES:

Mr. Windt has given more than 40 lectures across the country,
including presentations to the American Bar Association's
Insurance Law Section, the Texas Bar Associations's
Consumer Law Section, Mealey's and American Conference
Institute events, and the home offices of numerous insurance
companies.

Mr. Windt's book has been cited as authoritative by more than 400 hundred  courts
throughout the country. Examples of cases around the country that have cited Mr. Windt's
book are Lee Builder, Inc. v. Farm Bureau Mut. Ins. Co., 104 P.3d 997, 1003 (Kan. App.
2005) (Windt is an "authoritative commentator"); Nationwide Mut. Ins. Co v. Pasiak, 327
Conn. 275, 173 A.3d 888, 912 (2017) (citing Mr. Windt's book seven times); Nunn v. Mid-
Century Ins. Co., 215 P.3d 1196, 1203 (Colo. App. 2008) (Windt is a "prominent
commentator"); Talen v. Employers Mut. Cas. Co., 703 NW.2d 395, 413 (Iowa 2005)
(Windt's book is "a leading insurance text"); APAC Mut. Ins. Co v. CMA Mortgage, Inc.,

682 F.Supp.2d 879, 891 (D Ind. 2010) (Windt is "an oft-cited commentator"); <u>Hartford Fire Ins. Co v. Leahy</u>, 774 F.Supp.2d 1104, 1111 (WD. Wash. 2011) (Windt is "a prominent insurance law commentator"); <u>Pompa v. APAC Mut. Ins. Co.</u>, 520 F.3d 1139, 1147-48 (10th Cir. 2008) (Windt is "authoritative").

Mr. Windt has handled insurance claims, in all 50 states, for more than 70 insurance companies and hundreds of insureds. He has handled more than 10,000 claims over approximately 30 years. In addition to his work as a claims handler, Mr. Windt has written insurance policies for numerous insurance companies. During his more than thirty years of experience, Mr. Windt has become thoroughly familiar with the accepted customs, practices and standards in the insurance industry concerning insurance claims handling, coverage, and the duties to defend, settle and indemnify.

Mr. Windt has been retained as an expert witness on bad faith, coverage and breach of duty to settle issues in California, Oklahoma, Kansas, Oregon, Minnesota, Texas, Tennessee, Michigan, Washington, Alaska, Colorado, Arizona, Maryland, New Jersey, New York, Florida, Alabama, West Virginia, South Carolina, North Carolina, Montana, Ohio, Illinois, Nevada, Indiana, Louisiana, Montana, Pennsylvania, New Hampshire, Massachusetts, Hawaii, Utah, New Mexico, Wisconsin, Delaware, Georgia, Montana, Idaho, Connecticut, Missouri, the District of Columbia, Virginia, Kentucky, Maine, Iowa, Bermuda and the Virgin Islands.

# Exhibit B

*OPINION*

*UNITED STATES FIDELITY AND GUARANTY COMPANY*

*v.*

*ULBRICHT AND PM NORTHWEST*

*BY; ALLAN D. WINDT*
*August, 2021*

## *BACKGROUND*

1.      I specialize in insurance coverage, claim handling and bad faith.  In particular, I have been called upon to review and draft insurance policies, recommend coverage determinations, evaluate the propriety and reasonableness of such determinations, monitor and oversee the defense of insureds, and render advice concerning the handling of insurance claims in compliance with the applicable legal standards as well as the customs, practices and standards of the insurance industry. I have been retained by over 70 different insurance companies and hundreds of insureds to assist them with regard to the foregoing.  I have also been a frequent lecturer across the country on those issues. I have handled more than 10,000 insurance claims over approximately 30 years.

2.      I am the author of Windt, Insurance Claims and Disputes (West, 1981 first edition, 1988 second edition, 1995 third edition, 2001 fourth edition, 2007 fifth edition, 2013 sixth edition and 2021 supplement).  The book has been cited as authoritative by more than 400 different courts across the country.

3.      In addition, I have been retained as an expert witness and have rendered expert opinions on issues of coverage and duties to settle, defend and indemnify on behalf of both insurers and insureds in Washington, Ohio, North Carolina, Pennsylvania, South Carolina, Missouri, Kansas,  Illinois, Iowa, Texas, California, New York, Massachusetts, Mississippi, Oklahoma, Kentucky,  Nebraska, Arizona, Colorado, the District of Columbia,  Delaware, Georgia,  Michigan, Alaska,  Maryland, New Jersey, Florida, Alabama, West Virginia, Nevada, Indiana, Tennessee, Louisiana, New Hampshire, Montana, Hawaii, Utah, New Mexico, Wisconsin,  Idaho, Connecticut, Virginia, Bermuda, and the Virgin Islands.

2

4.     During my more than thirty years of experience, I have become thoroughly familiar with the accepted customs, practices and standards in the insurance industry concerning insurance claims handling and coverage and duties to defend and indemnify.

## ANALYSIS

### I.  It Was Reasonable for USF&G to Not Provide PM Northwest a Defense in April 2018

5.     It is reasonable for insurance companies to believe that they are not required to afford coverage if they are not legally obligated to afford coverage. How an insurer normally determines whether it has the legal right to deny coverage is by considering the policy language, rules of construction, analogous case law interpreting the same or similar policy language, and any relevant statutes. Accordingly, in a typical case, one would determine whether an insurer's decision not to afford coverage was reasonable by considering whether, in light of those four things, the insurer could reasonably have believed that it had the legal right to deny coverage.

6.     The case at hand is not a typical case. Since the insurance policy could not be located, how an insurer would determine whether it had the legal right to deny coverage would be by first considering who had the burden of proving that a policy existed and what the terms and conditions of the policy would have been. Accordingly, in the matter at hand, one would begin a reasonableness analysis by evaluating whether it is reasonable for an insurer to conclude that the foregoing burden of proof is on the insured. It is my opinion that it was reasonable for USF&G to conclude that the burden of proof was on the insured. That is consistent with my understanding of the industry practice, and it is consistent with my book and the cases cited in my book. See section 9.1, pages 9-5 to 9-6, of my book.

> The insured also has the burden of proving the existence of
> the policy. If the policy is missing, the insured must prove that
> there would have been coverage under the terms and conditions of
> the policy. (Collecting cases.)

7.     Prior to July 9, P.M. Northwest had not satisfied the foregoing burden.

Necessarily, therefore, it was reasonable for USF&G not to afford coverage prior to July 9.[1]

## II. It Was Reasonable for USF&G Not to Provide PM Northwest
## a Defense After USF&G Received the Certificates of Insurance on July 10, 2018

8.     On July 9 and 10, 2018, USF&G received policy numbers and certificates of

insurance from PM Northwest .One cannot tell from the certificates what the terms and

conditions of the policies were.

9.     The questions that arises, therefore, is when (as discussed above) an insurer

reasonably concludes that the insured has the burden of proving what the terms and conditions

are of a missing policy,  and the insured does not satisfy that burden, can the insurer reasonably

conclude that the insurer is not obligated to afford coverage (defense cost benefits or any other

---

[1]Note that USF&G later made payments under policies for which no policy documents
containing policy terms were ever located, and despite the fact that USF&G might have been able to
successfully deny coverage for the settlement, e.g., (1) because PM Northwest's settlement was entered
into without USF&G's consent, (2) because Mr. Ulbricht's bodily injury might have taken place after the
USF&G policies had expired, (3)because pre-symptom bodily injury might have been insufficient to
trigger coverage, since no damages would have been awarded for such bodily injury, and even assuming
that Mr. Ulbricht incurred bodily injury during the USF&G's policy periods, that injury might have been
solely pre-symptom bodily injury, and (4) because PM Northwest might have had the burden of proving
how much of the settlement was paid for a reason covered by the policy, and PM Northwest might have
been unable to satisfy that burden. See also footnote 5. In my opinion, USF&G overpaid, although for the
reason discussed in section 9.26, page 9-164, of my book, I am not surprised  that USF&G overpaid.

> (T)he fact that an insurance company elects to pay benefits,
> rather than exercising its legal right to have a court adjudicate whether
> any money was owed, is evidence of good faith, not bad faith. Insurers
> can ultimately pay sums that they do not owe because it is believed to be
> good business or in order to avoid the cost of  litigating the issue.

4

benefits). In my opinion, subject to one proviso, the answer is yes; if an insured has failed to establish the terms of an insurance contract, at a minimum, it is reasonable for the insurer to conclude that the insured has failed to establish that a loss is encompassed by the general coverage provisions (insuring agreements) of the insurance contract.

10.      The proviso to the foregoing is that it is sometimes  possible to use secondary evidence to figure out what the policy stated without finding the policy itself. I am presently unaware of facts that would cause this matter to be encompassed by that proviso.

11.      Specifically, with regard to a duty to defend, at a minimum, it is reasonable to conclude that if an insured has not satisfied his or her obligation to establish the  terms of the policy (and especially the terms of the  insuring agreement), the insured has not satisfied his or her obligation to establish that coverage might exist under the terms of the policy.

12.       In connection with writing my book and updating the book, I have read every reported insurance case in the country back to the 1940s, and I do not believe that any court in the country has ever held, when addressing the "potential" rule, that it is enough that there is a potential that policy provisions might exist that fit the facts.[2]

13.       In other words, when one states that an insurer must provide the insured a defense if there is a potential for coverage, it is reasonable to conclude that what one is addressing is the uncertainty created by the claim made against the insured, not the uncertainty whether the insured purchased  a policy that would be applicable.

---

[2]I am, however, aware of cases holding, consistent with USF&G's conduct in this case, that an insurer cannot have a duty to defend unless the insured has, first, proven the terms of the missing policy.

14.     The foregoing is consistent with the fact that, in determining whether an insurer has a duty to defend, one must construe the insurance policy in order to determine whether the complaint potentially brings the matter within the terms of the coverage. If one does not, therefore - - in the matter at hand, as of 8/2/18 - - know what the terms of the policy are, one cannot begin the process of determining whether the complaint potentially brings the matter within the terms of the coverage.

15.     The foregoing is also consistent with the fact that the "potential" rule requires an insurer to resolve in favor of the insured all uncertainties regarding the sufficiency of the allegations to trigger coverage. That is different than saying that the "potential" rule requires an insurer to resolve in favor of the insured all uncertainties regarding what the insured chose to purchase as its insurance policy.

16.     For all of the foregoing reasons, if I had been handling the subject claim prior to August 2, 2018, it would not even have occurred to me that USF&G might have had a duty to defend. It would not have occurred to me because, as of that date, USF&G did not know the terms of any of its policies; it did not know whether PM Northwest had purchased a policy that might give rise to coverage. The fact that it apparently also did not occur to the USF&G employees was understandable and reasonable, whether or not it proves to have been a mistake.

### III.   USF&G's Attempt to Locate the Policies was Reasonable

17.     When PM Northwest asked USF&G in March 2018 whether USF&G had issued a liability insurance policy that afforded coverage for PM Northwest, USF&G did not ignore PM Northwest's request. USF&G attempted to determine whether any such policy

existed.[3] The fact that USF&G was unsuccessful does not mean that USF&G's investigation was not reasonable . In my opinion, it was reasonable. Moreover, even if one were to believe that USF&G's investigation had been negligent, that would not mean that USF&G's investigation constituted bad faith.

18.     In every investigation, there is always something additional that could have been done by the insurer. The fact, therefore, that one can always identify something that the insurer could have done, but failed to do, does not mean that every investigation is done in bad faith or even negligently.  For example suppose that, before denying coverage for a fire at the insured's house on the ground that the insured set the fire, the insurer interviewed the neighbors in the closest three houses  to the insured's house to ask whether they had  observed any suspicious strangers in the area prior to the fire, or whether they were aware of any facts that might constitute circumstantial evidence that the fire had not been an arson set by the insured. The insurer's investigation could have encompassed the closest six houses. And if the neighbors in the closest six houses had been interviewed, the insurer could still have done more; it could have interviewed the neighbors in the closest ten houses. Etc.

19.     Turning to the facts of this case, apparently, Ms. Berneche - - who was in charge of the search between March 28 and July 9 - - believed that since the document management department could not locate the policies, no policies existed. Then, on July 10, the day Ms. Berneche received the certificates of insurance, a new USF&G employee, Mr. Quimby, became the person in charge of the search. He then caused USF&G to take the following steps.

---

[3]PM Northwest (Ms. Huntley) left a telephone message on March 17,2018. Ms. Berneche of USF&G called Ms. Huntley back on April 5, conducted an investigation that was completed prior to April 20, and told Ms. Huntley on April 20 that USF&G had been unable to locate any policies.

a. On July 11, Mr. Quimby asked the document
management department to do another search, this
time using not just PM Northwest's name, but also
the policy numbers set forth on the certificates that
USF&G had been provided on July 10.

b. On July 18, the document management department
advised Mr. Quimby that no policy could be found.

c. After being told by the document management
department , on July 31, that there was nothing
more that the department could do to find a policy, a
lawyer working for the large case group directed a
that a search be done for other records that could be
material.

d. That led to a paralegal, Cara Corson, on August 3,
becoming involved in the search, and apparently
between August 17 and August 21, with the help of
others, searches were prepared and utilized, but no
policy documents were located - - as evidenced by
Ms. Corson's August 21 report.

e. As a result, on August 23, another paralegal, Ms.
Bowers, was asked to do her own search. Ms
Bowers conducted a search between August 23 and

8

August 29, resulting in Ms. Bowers preparing an

August 29 report disclosing that she had found

some policy documents in old claims files.

f.      Between August 29 and September 7, Ms. Bowers

attempted to locate additional policy documents by

continuing to look for and review old claim files.

20.    Summarizing, for the combination of three reasons, USF&G's policy search was

reasonable. Focus, first, on the period between March 28 (when PM Northwest asked USF&G to

look for policies) and July 9-10 (when PM Northwest provided USF&G policy numbers and

certificates of insurance). Apparently, it had not occurred to Ms. Berneche that a policy could

exist if the document management department could not locate the policy.  I am unaware of any

reason to conclude that Ms. Berneche could not, at that time, reasonably  have so believed.

21.    Focus, next, on the period between July 9-10 and August 3. Since PM

Northwest had provided USF&G policy numbers and certificates of insurance, one of two things

was true: either (a)  the document management department had not done a thorough job

searching the records, or (b) a policy could exist despite the fact that the document management

department could not locate the policy. The people who then took over responsibility for the

search on July 10, apparently recognized that fact, and addressed both options. First, on July 11,

the document management department was asked  to do another search. Second, after learning,

on July 18, that the document management department had still been unable to locate a policy,

and being told on July 31 that there was nothing more that the department could do, on August 3,

a lawyer working for the large case group asked a paralegal, Ms. Corson, to try to locate policy

9

information. I am unaware of any reason to conclude that those actions were unreasonable.

22.     Finally, focus on the period between August 3 and September 7 . Between August 3 and August 17,  Ms. Corson did  searches or had searches done. Between August 17 and August 20, she confirmed that USF&G had issued three policies.  Another paralegal , Ms. Bowers, then took over, and the search  for copies of policies was continued by and through Ms. Bowers. With assistance,  Ms. Bowers was able to locate some policy documents in old  files on August 27. The search was continued by obtaining copies of additional old claim files. The search was completed by September 7. The  investigation by and through Ms. Corson and Ms. Bowers, beginning in August  and ending on September 7, was reasonable.

23.     By email dated July 9, USF&G was told that a mediation was scheduled for July 18, and that the trial had been set for August 6.  As a practical matter, therefore, no matter what USF&G  did, USF&G did not have the time, prior to the mediation and trial, to (a) locate a policy or determine what the terms of the policy would have been, (b) evaluate whether coverage existed for the claims begin made against PM Northwest, and (c) evaluate the merits of the claims being made against PM - -  in order to determine whether USF&G had a duty to make a settlement offer and , if so, in what amount. All that USF&G could do at that point regarding settling[4] - - after having learned on July 9 that a trial was imminent - - was tell PM to look after its own interests, which is exactly what USF&G did.  In the meantime, USF&G continued to look for any policies.

24.     In short, by failing sooner to ask USF&G to look for policies, PM made it

_____

[4]With regard to a duty to defend , it was too late for USF&G to be able to select defense counsel and provide a defense. All that USF&G could do was pay for the bills that it received after a settlement or after a  trial in the event that it turned out that the policy terms triggered defense cost coverage.

impossible, as a practical matter, for USF&G to do in July what would have had to be done in order for USF&G to be in a position to offer money in a settlement on PM's behalf. Because of PM's delayed notice to USF&G, all that USF&G could do, as a practical matter, was leave it to PM to decide whether   to settle and (a) if PM settled, USF&G would then decide (after having completed its policy search , etc.) whether to reimburse PM for all or part of the settlement, and (b) if PM went to trial and was found liable, USF&G would then decide (after having completed its policy search, etc.) whether to pay all or part of the judgment. The speed, therefore, with which USF&G looked for  policies was immaterial.

25.     In short, at every stage, the conduct of the USF&G's employees was reasonable. The policy documents that were found in September could have been found sooner if the employee ( Ms. Bowers) best able to locate the documents had been asked to do the job in April, instead of someone in the document management department being asked to do the job. It is always true, however, when a mistake is made by an employee, that a better employee would not have made the same mistake. That does not mean that the employer is always guilty of bad faith. The fact is that some employees are better than others. In the matter at hand, Ms. Berneche  was mistaken in believing that the employees in the document management department were the most capable people for searching for policies. Although Ms. Berneche did not know it, there were other USF&G employees who were better at searching for policies.

26.     Based upon Mr. Shaw's 8/14/18 affidavit, PM Northwest is apparently taking the position that PM incurred consequential damages because of USF&G's failure to provide PM a defense. Specifically, "the uncertainty of ultimate insurance indemnification" led  PM to pay in settlement more than it would otherwise have paid. Even if USF&G had provided PM a defense,

11

however, any rational insurer would have done so subject to a reservation of the right to deny

coverage for all or part of any judgment entered against PM. As a result, it is my opinion that if

USF&G had provided PM a defense, consistent with good faith and industry practice, "the

uncertainty of ultimate insurance identification" would have remained[5] - - so logically, if that was

the reason for PM paying extra, wouldn't PM have paid extra even if USF&G had provided PM a

defense as PM had requested?

27.     If PM Northwest is contending that USF&G acted unreasonably because it had

had a duty to settle for the lower amount that the plaintiff had been willing to accept, I disagree.

To begin with, since as discussed above, it is reasonable  to conclude that USF&G did not have a

duty to defend, it is reasonable to conclude that USF&G did not have a duty to settle (which duty

is governed by a more demanding test). Moreover, based upon the facts that USF&G knew or

should have known on 8/2/18, it would have been reasonable for USF&G to believe that it did

not have a duty to fund a settlement.

---

[5]For example, if a USF&G policy was triggered by the date of bodily injury, based upon the
evidence presented at trial regarding what Mr. Ulbricht did (and where) and what PM did (and
where) would a judgment entered against PM have been entered because of relevant bodily injury
that took place during the policy period, and for which PM was responsible? If so, how much of
the judgment would have been entered because of such bodily injury? Or, if a USF&G policy
was triggered by the date of the occurrence, would a judgment entered against PM have been
entered because of an occurrence (relative to PM's liability) that took place during the policy to
period? If so, how much of the judgment would have been entered because such an occurrence?
One would expect that USF&G would also have reserved the right to deny coverage because,
e.g., it might have later been determined that only claims-made coverage existed, and no claim
was made during a policy period. In addition, any applicable policy might have contained a self-
insured  retention, or been exhausted by the payments of other claims. In addition, the policies
might have afforded coverage only for claims for property damage, or only for specific locations,
or only for specific operations. In addition, the policies might, for example, have contained a
pollution exclusion, which a court might have held applied to asbestos.

28.     Finally, with regard to the fact that USF&G reserved the right to seek reimbursement if the Court of Appeals found that the stipulated judgment was unreasonable, that was certainly a reasonable position to take at the time. Note, too, that as discussed earlier in this report, even if it had been undisputed that the amount of the settlement was reasonable, USF&G appears to have overpaid. As for the issue of USF&G paying post-judgment interest in an amount in excess of the policy limit, since the policy documents that were found do not contain a provision obligating USF&G to make a payment in excess of it policy limit, such a payment was not undisputedly owed. Note, too, that as discussed in this report, it is reasonable to conclude that coverage did not exist for the judgment; as a result, for that additional reason, it is reasonable to conclude that coverage did not exist for the interest on the judgment.

29.     I have reviewed the documents on the enclosed list.

30.     I have enclosed a resume and list of prior testimony.

31.     My hourly rate is $595.

_8/26/21_
Date

ALLAN D. WINDT

13

**<u>Documents reviewed</u>**:

- Pleadings in USF&G v. Ulbricht
- Stipulated Protective Order
- Parties' Initial Disclosures and Discovery Responses
- USF&G's Production of documents (TRAV000001-2869)
- Ulbricht's Production of documents (AIG000001-000431, Arcina000001-000045, HUB000001-001015, NATSUR000001-000214, PM Northwest000001-000284, Riverstone000001-000100, Ulbricht000001-000032, Zurich000001-000094)
- Documents produced by defendants National Surety and Allianz's (NSC000001-001363)
- Documents produced by defendant Maryland Casualty Company (MAR0000001-000247)
- Documents produced by defendant TIG (TIG0000001-000310)
- IFCA notices dated November 29, 2019 and February 12, 2020
- Responses to IFCA notices dated December 19, 2018 and March 5, 2020
- 2018-11-09 Letter to David Shaw and Matthew Bergman.pdf
- Petition for Discretionary Review and Respondent Karen Ulbricht's Response to USFG's Petition for Discretionary Review in Supreme Court in *Ulbricht v. CBS Corp.*, No.18-2-02146-4, Superior Court, King County
- Deposition of Karen Berneche dated August 18, 2021 (rough transcript and exhibits 1-14)
- Deposition of James Quimby dated August 19, 2021 (rough transcript and exhibits 15-35)
- Deposition of Cara Corson dated August 20, 2021 (rough transcript and exhibits 36-48)
- WAC 284-30-330
- WAC 284-30-350
- WAC 284-30-920

# Exhibit C

*REBUTTAL OPINION*

*UNITED STATES FIDELITY AND GUARANTY COMPANY*

*v.*

*ULBRICHT AND PM NORTHWEST*

*BY: ALLAN D. WINDT*

*October 4, 2021*

I have been asked to provide comments with respect to the opinions expressed in the Expert Report of Charles M. Miller dated August 27, 2021.

With regard to his opinions on claim handling, Mr. Miller's testimony appears to be based upon the assumption that USF&G had a duty to begin handling PM Northwest's claim before anyone was aware of any of the terms of any of the missing policies. However, it is reasonable to believe that the claim handling process cannot begin until enough is known about the policy terms to be able to evaluate whether the insured is entitled to any policy benefits.

For example, Mr. Miller criticizes USF&G employees for failing to: (a) set up a claim file;[1] (b) investigate the merits of the claims against PM Northwest;[2] (c) obtain and read the complaint that had been filed against PM Northwest;[3] (d) do a "coverage analysis" (even though USF&G did not know any of the policy terms, or know whether it would ever know any of the policy terms);[4] (e) agree to a settlement on PM Northwest's behalf (even though USF&G did not know any of the policy terms, or know whether it would ever know any of the policy terms);[5] (f) research "how to handle asbestos claims";[6] (g) evaluate Mr. Ulbricht's settlement offer;[7] (h) evaluate the potential verdict value of Mr. Ulbricht's claim;[8] (i) write PM Northwest that

---

[1] See paragraph 24 of Mr. Miller's report.

[2] See paragraphs 20 and 58 of Mr. Miller's report.

[3] See paragraphs 43, 58 and 59 of Mr. Miller's report.

[4] See paragraph 82 of Mr. Miller's report.

[5] See paragraph 136 of Mr. Miller's report.

[6] See paragraph 60 of Mr. Miller's report.

[7] See paragraphs 69, 127 and 128 of Mr. Miller's report.

[8] See paragraphs 60, 133, 136 and 137 of Mr. Miller's report.

judgment might be entered against PM in an amount exceeding the policy limits;[9] and (j) set a reserve.[10]

All of Mr. Miller's criticisms of USF&G's claim handling are things that USF&G did or did not do prior to August 29, 2018 – before USF&G learned any of the terms of any of the insurance policies. As a result, although the foregoing things are, as Mr. Miller asserts, things typically associated with a claim, it was reasonable for those things not to be done in this case prior to August 29, because this was not a typical situation. In a typical situation, the insurer knows the policy terms, which enables the insurer to do the things typically associated with claim handling – determining which claims, if any, are covered, which, in turn, enables the insurer to set a reserve, determine whether it should offer to contribute to a settlement on behalf of the insured, etc. By comparison, when, as in the matter at hand, the insurer does not know any of the policy terms, or whether it would ever know any of the policy terms, it is reasonable for an insurer not to do those things.

_10/7/21_

ALLAN D. WINDT

---

[9] See footnotes 45 and 46 and paragraphs 130 to 132 and 137 of Mr. Miller's report.

[10] See footnote 49 of Mr. Miller's report.

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WASHINGTON

# AT SEATTLE

UNITED STAES FIDELITY AND
GUARANTY COMPANY ,

    Plaintiff,

  v.

KAREN ULBRICHT, et al,

    Defendants.


KARENT ULBRICHT, et al.,

    Plaintiffs,

  v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,

    Defendants

UNITED STATES FIDEILTY AND
GUARANTY COMPANY,

    Third-Party Plaintiff,

  v.

ALLIANZ INSURANCE COMPANY, et al.

    Third-Party Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:20-cv-00617-JLR

EXPERT REPORT OF CHARLES M.
MILLER

EXPERT REPORT OF CHARLES M. MILLER
Page 1

communication further underscores Berneche's limited and incomplete investigation. Clearly she should ask for the actual policies if they were available, because that would settle the issue—then there would not be any lost policies.  Further, there is nothing in the documents produced to date indicating that Berneche, or anyone else, talked with the agent, so this again may be Berneche sending incorrect information.

47.     The "Request For BI Policy" form, dated April 11, 2018, sent by Berneche to "BI Document Management, 2CR, Home Office," was for a "St. Paul Request," which, according to the from "includes USF&G" (Bates No. TRAV 1031).  Only three search requests are made: (1) "Policy(ies) listed only," (2) "AER (Please include SAI and/or any policy number for the account," and (3) "AER w/All GL & Package Policies" (Id.). Although "AER w/Claims History," could have been requested on the form, it was not.[30] Rather, Berneche only asked for the following: "The agent is looking for a GL or WC policy for this insured.  The insured at the time was located in Mount Vernon, WA and the employee worked during the policy period above.  Just want to see if we have a policy for this company" (Id.).

48.     On April 12, 2018, Berneche reported to Huntley that they were still searching "through quite a few years for the policy or policies . . . but it should be soon" (Bates No. TRAV 1038).

49.     On April 20, 2018, now three weeks following the notice of the claim, Phyllis Thompson of Travelers responded to Berneche's request attaching "a copy of

---

[30] It appears that Berneche could also have requested "Underwriting files," but did not do so (Id.).

the original BI Policy request form." (Bates Nos. TRAV 1008 & 1030).[31]  On the form

Thompson reported: "searched API Northbrook USFG Opus Ame CCR nothing found

for this named insured" (Bates No. TRAV 1031).  On the same date, Berneche wrote

Huntley the following:

> I had requested that they search for any GL and WC policy
> that included the dates that the claimant had worked for P.M.
> Northwest, Inc.  Unfortunately no policies were found for that
> time period.
>
> (Bates No. TRAV 1008).

50.     This was, in effect, a denial of coverage based on an incomplete and

inadequate investigation that did not include, in accordance with insurance industry

standards, at the least the following:

- Interviewing the insured
- Interviewing any witnesses to the history of the coverage[32]
- Interviewing any accountants who may have had knowledge of the policies
- Obtaining any documents from the insured
- Conducting a search for older claim files
- Conducting a search for underwriting files

### ii.     USF&G Certificates of Insurance Are Discovered and Provided to Travelers.

51.     In May 2018, Colin Mieling, an associate in Bergman's firm, had submitted

a public records request to the Washington State Department of Labor & Industries for

---

[31] Presently, the meaning of the terms used in this response is not known.

[32] Likewise, Travelers advises its claims handlers that "[y]ou should contact all the parties you believe are necessary to conduct your investigation such that you thoroughly understand what occurred" (Knowledge Guide, Bates No. TRAV 2797).

147.    Significantly, Travelers did not timely request a copy of the complaint so that it could determine the scope of its defense obligation to P.M. Northwest.  Clearly, the complaint invoked Travelers' defense obligation pursuant to the CGL policies issued by USF&G, as demonstrated in the USF&G policy documents discovered in August 2018.

## V.    CONCLUSION

148.    I understand that there is additional discovery yet to be completed in this case.  In particular, I understand that some depositions have only recently been taken, but I have not yet had time to review them.  Once they are reviewed, along with the results of any additional discovery, I may supplement this report.  The opinions expressed herein are subject to change or modification, depending on the results of any future investigation and discovery in this case.

27th day of August 2021

_____

"insured is served," which was the case with P.M. Northwest, and yet Travelers did nothing.