1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

UNITED STATES FIDELITY AND
GUARANTY COMPANY,

                   Plaintiff,

    v.

KAREN ULBRICHT, et al.,

                  Defendants.

CASE NO. C20-0369JLR

ORDER

16

17

18

19

20

21

22

## I.   INTRODUCTION

There are four motions pending before the court:  (1) Defendants PM Northwest, Inc. ("PM Northwest"), Heide Ulbricht, Karen Ulbricht, and Robert S. Ulbricht's (the "Ulbrichts") (collectively, "Defendants") motion to realign the parties in this case (Realignment Mot. (Dkt. # 75); Realignment Resp. (Dkt. # 82); Realignment Reply (Dkt. # 88)); (2) Plaintiff United States Fidelity and Guaranty Company's ("USF&G") motion for summary judgment (USF&G MSJ (Dkt. # 70); USF&G MSJ Resp. (Dkt. # 112);

1   USF&G MSJ Reply (Dkt. # 104)); (3) Defendants' motion for partial summary judgment

2   (Defs. MSJ (Dkt. # 83); Defs. MSJ Resp. (Dkt. # 91); Defs. MSJ Reply (Dkt. # 102)); and

3   (4) Defendants' motion to seal materials relied on in opposition to USF&G's motion for

4   summary judgment (Seal Mot. (Dkt. # 94); Seal Reply (Dkt. # 114)), which USF&G joins

5   (Seal Resp. (Dkt. # 109)).  Having considered the submissions of the parties, the relevant

6   portions of the record, and the applicable law, the court:  (1) DENIES Defendants'

7   motion to realign the parties (Dkt. # 75); (2) GRANTS in part and DENIES in part

8   USF&G's motion for summary judgment (Dkt. # 70); GRANTS in part and DENIES in

9   part Defendants' motion for partial summary judgment (Dkt. # 83); and GRANTS in part

10  and DENIES in part Defendants' motion to seal (Dkt. # 94).[1]

11                              **II.    BACKGROUND**

12          This action arises out of a personal injury lawsuit the Ulbrichts filed on January

13  24, 2018 in King County Superior Court against 18 defendants, including PM Northwest.

14  (Compl. (Dkt. # 1) ¶ 9; SAC (Dkt. # 27) ¶ 3.4; 12/3/21 Ackel Decl. (Dkt. # 86) ¶ 2, Ex. A

15  (the "Underlying Action").)  The underlying action alleged that Robert Ulbricht

16  contracted mesothelioma[2] as a result of prolonged exposure to asbestos while working

17  alongside PM Northwest contractors at an oil refinery in Anacortes, Washington in the

18  //

19
20          [1] USF&G requested oral argument on the parties' cross-motions for summary judgment.
    (*See* USF&G MSJ Reply; Defs. MSJ Resp.)  However, the court finds that oral argument would
    not be helpful to its disposition of the matters addressed in this order.  *See* Local Rules W.D.
21  Wash. LCR 7(b)(4).

22          [2] Mesothelioma is "a form of cancer closely associated with asbestos exposure."
    *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1172 (9th Cir. 2016).

1   1970s and 80s.  (SAC ¶ 3.5; Underlying Action at 3.)  The underlying action was initially

2   scheduled for trial on July 8, 2019, but, at the Ulbrichts urging, was expedited to August

3   6, 2018.  (11/16/21 Brownstein Decl. (Dkt. # 71) ¶¶ 1-2, Exs. 1-2.)

4          Sometime around the middle of March 2018, PM Northwest's office manager,

5   Kesha Huntley, began looking through old files housed in PM Northwest's office in an

6   effort to locate information about insurance policies that might have covered any liability

7   they faced from the underlying action.  (*See* 12/3/21 Ackel Decl. ¶ 4, Ex. C ("Huntley

8   Depo. Tr.") at 41:15-42:11.)  She also discussed the search with former PM Northwest

9   officials to see if there were other company records that she should inspect as part of her

10  investigation.  (*Id.* at 41:13-43:14.)  This effort did not lead to the discovery of policy

11  documents, but Ms. Huntley's predecessor, Linda Chambers—who served as PM

12  Northwest's office manager in the 1970s and 80s—was able to point her to old PM

13  Northwest meeting minutes.  (*See id.* at 42:21-43:03.)  The meeting minutes indicated

14  that, at some point prior to 1981, PM Northwest had an insurance policy with USF&G.

15  (*See* 12/3/21 Ackel Decl. ¶ 7, Ex. F at 3.)  The minutes also listed the insurance broker

16  that PM Northwest used at the time—Dougan, Eader, Reynolds & Wheller, Inc.—

17  although Ms. Huntley was unsuccessful in finding contact information for the firm.

18  (Huntley Depo. Tr. at 28:17-29:10.)

19          Ultimately, after going "through everything that [PM Northwest] had," Ms.

20  Huntley could not find any policies or information about policies from the relevant time

21  period (*id.* at 51:18-19), although she acknowledged that files created before 2000 were

22  //

ORDER - 3

1  likely destroyed in an office flood in the 1990s or were shredded prior to PM Northwest

2  relocating office space "around 2010, 2012" (*id.* at 52:15-54:1).

3        On March 19, 2018, Ms. Huntley reached out to PM Northwest's current

4  insurance broker and asked for assistance locating old policies but was told that they

5  would not have relevant information because their engagement with PM Northwest did

6  not begin until 1996.  (12/3/21 Ackel Decl. ¶ 5, Ex. D.)  The broker did offer that she had

7  checked the Washington Labor & Industries Contractor Registration website "to see if

8  they had insurance history online," but found that the state's registry "only goes back to

9  2012."  (12/3/21 Ackel Decl. ¶ 6, Ex. E.)

10       Ms. Huntley first contacted USF&G[3] on March 27, 2018.  (12/3/21 Ackel Decl.

11  ¶ 9, Ex. H at 2.)  She sent the following message to "claims@travelers.com":

12       I'm looking for information on an old policy that PM Northwest, Inc. had in
         the 70's or early 80's.  I don't have a number for it all I can find is it looks
13       like we had a [General Liability] policy with U.S.F.&G.  I called the
         Traveler's main office and they directed me to this email to try and find out
14       more info.  We got served with some papers so I'm trying to see if the lawyer
         we have been talking to is covered under our old policy or if we need to find
15       a new one.  Any help you can give me would be appreciated.  It might be
         under PM Northwest, Inc. or P.M. Northwest, Inc. everyone kind of had their
16       own way of writing it.

17  *Id.*  USF&G did not respond right away so Ms. Huntley resent her email a week later, on

18  April 4, 2018.  (*Id.* at 1.)  The following day, Karen Berneche, a senior consultant in

19  USF&G's Claim Regulatory Compliance group, responded to Ms. Huntley to request

20  additional information.  (*See id.*)

21

22       [3] For consistency and ease of reference, the court refers to USF&G's affiliate, the
    Travelers Companies, Inc. ("Travelers"), as "USF&G" throughout this order.

ORDER - 4

1    Ms. Huntley responded the same day with answers to Ms. Berneche's questions.

2    (12/3/21 Ackel Decl. ¶ 10, Ex. I at 1.)  She also clarified that "[a]s of right now there is

3    no claim but we are named in a lawsuit by a man named Robert Ulbricht," which she

4    speculated would result in PM Northwest's dismissal "after a deposition," though she

5    noted that PM Northwest nevertheless needed to resolve the insurance coverage issue

6    because PM Northwest's "lawyer fees need to go thru [sic] it."  (*Id.*)

7    On April 12, 2018, Ms. Huntley followed up with Ms. Berneche to ask whether

8    there was "[a]ny new news," because PM Northwest's "lawyer is going to a deposition

9    on Friday so it would be nice to open a claim here for it soon."  (12/3/21 Ackel Decl.

10   ¶ 11, Ex. J at 1.)  Ms. Berneche responded the same day that no policy had yet been

11   located but that, even if the policy was located, USF&G would still "have a claim

12   adjuster look at it to determine if there is any coverage" before opening a claim.  (*Id.*)  On

13   April 20, 2018, Ms. Berneche notified Ms. Huntley that USF&G' records department had

14   completed its search "for any [general liability] and [workers compensation] policy"

15   during "the dates that the claimant had worked for P.M. Northwest, Inc.," but had been

16   unable to locate any such policies.  (12/3/21 Ackel Decl. ¶ 12, Ex. K at 1.)

17   Although Ms. Huntley took this news as an indication that USF&G would not be

18   opening a claim, Ms. Berneche clarified in her deposition that what she meant to convey

19   was that, while her initial search was unsuccessful, Ms. Huntley should continue

20   searching for a policy number but, whether a policy number was located or not, the

21   available information would still be passed along to USF&G's claim department for

22   further investigation.  (12/3/21 Ackel Decl. ¶ 13, Ex. L ("Berneche Depo. Tr.") at

1    81:3-83:3.)  Despite the fact that Ms. Berneche expected that Ms. Huntley would

2    conclude her search for a policy number within a couple of days of their April 20, 2018

3    email exchange, she did not follow up with Ms. Huntley.  (*Id.* at 83:4-12.)  Nor did Ms.

4    Berneche submit the information Ms. Huntley had provided to USF&G's claim

5    department at that time.  (*Id.* at 83:13-22.)  As she stated in her deposition, the matter

6    simply "fell off [her] radar."  (*Id.* at 107:9.)

7          The next communication between PM Northwest and USF&G came on July 9,

8    2018, when Ms. Huntley emailed Ms. Berneche and reported that their attorney had

9    located the old policies and that PM Northwest "actually did have one from

10   3/31/77-3/31/78 with USF&G.  The policy number is [1CCA56045]."  (12/3/21 Ackel

11   Decl. ¶ 14, Ex. M at 2.)  Ms. Huntley further indicated that "We need to get a claim

12   opened ASAP" because the "[t]rial date is set for 8/6/18 and mediation is 7/18/18."  (*Id.*)

13         On July 10, 2018, Ms. Berneche requested that Ms. Huntley "scan and send me the

14   policy information (specific to this claim) and any documents, claimant, insured, full

15   contact information for all parties involved, etc[.]," as well as "the actual policy," which

16   she would then "forward to [USF&G's] Customer Care Center to set up the claim."  (*Id.*

17   at 1.)  Ms. Huntley responded immediately to provide five (5) certificates of insurance,

18   which she mistakenly identified as the actual policies, showing that PM Northwest held

19   general liability policies with "USF&G from 1977-1982."  (*Id.* at 1, 14-18.[4])  Ms.

20   //

21         ⁴ The policies are:  1CCA56045 (1977-78); 1CCB12875 (1978-79); 1CCC70507 (1979-
22   80); 1CCD17906 (1980-81); and MP50769 (1981-82).  The court refers to these five (5) policies,
     collectively, as the "USF&G policies" or the "five policies."

1    Huntley also attached the complaint and amended complaint from the underlying action

2    and encouraged Ms. Huntley to contact PM Northwest's attorney for further information

3    about the litigation.  (*Id.* at 4-13)

4          James Quimby, an Account Executive in USF&G's Special Liability Group,

5    responded by letter dated July 10, 2018 to confirm that USF&G had received the

6    litigation documents and had "order[ed] the applicable [insurance] policies from [its]

7    off-site storage facility."  (12/3/21 Ackel Decl. ¶ 15, Ex. N.)  Once those policy

8    documents arrived, USF&G would then review the information Ms. Huntley had

9    provided "in light of the coverage provided by the policies."  (*Id.*)  Mr. Quimby advised

10   that, "[p]ending the outcome of [USF&G's] coverage and policy investigation, PM

11   Northwest should continue to protect its own interest with any court imposed deadlines

12   and/or answer dates."  (*Id.*)

13         On July 16, 2018, Mr. Quimby responded to a voicemail left by Ms. Huntley

14   regarding the Ulbrichts's demand for mediation in the underlying action and informed her

15   that she could send the mediation demand to his attention, but that USF&G was still

16   "trying to locate copies of the policies."  (12/3/21 Ackel Decl. ¶ 16, Ex. O at 1.)  He

17   reiterated that "[p]ending the outcome of [USF&G's] coverage and policy investigation,

18   PM Northwest should continue to protect its own interests" in the underlying action.  (*Id.*)

19   Ms. Huntley responded moments later with the Ulbrichts's July 9, 2016 mediation letter

20   demanding "$3.5 million from PM Northwest."  (*Id.* at 3.)

21         Mediation between PM Northwest and the Ulbrichts began on July 18, 2020.

22   (12/3/21 Ackel Decl. ¶ 18, Ex. Q ¶ 11.)  During the course of mediation, PM Northwest's

1    attorney, David Shaw, contacted Mr. Quimby and learned that USF&G had still not

2    located the policies and was operating on the assumption that "it was the insured's

3    obligation . . . to prove the terms of the policies." (*Id.*)  Ms. Huntley also contacted Mr.

4    Quimby on July 30, 2018 to ask whether USF&G had found "[a]nything on [PM

5    Northwest's] old Policies yet." (12/3/21 Ackel Decl. ¶ 17, Ex. P at 1.)  Mr. Quimby

6    responded to Ms. Huntley on August 2, 2018, and informed her that USF&G intended to

7    finalize its investigation "in the next few days" and would "respond further[] once we

8    have additional information." (12/3/21 Ackel Decl. ¶ 19, Ex. R at 1.)  Once more, he

9    reiterated that "[p]ending further review of this matter, PM Northwest should continue to

10   protect [its] interests." (*Id.*)

11       On the same day, PM Northwest and the Ulbrichts entered into a stipulated

12   settlement agreement for judgment in the amount of $4.5 million, an assignment of rights,

13   and a covenant not to execute (12/3/21 Ackel Decl. ¶ 18, Ex. Q ¶ 14; 12/3/21 Ackel Decl.

14   ¶ 20, Ex. S at 7-8), which they filed as a stipulated judgment in the underlying action on

15   August 3, 2018 (12/3/21 Ackel Decl. ¶ 21, Ex. T).

16       PM Northwest sent the settlement agreement, stipulated judgment, motion for

17   reasonableness determination, and notice for hearing to USF&G on August 15, 2018.

18   (*Id.* ¶ 22, Ex. U.)  The following day, Cara Corson, a legal specialist in USF&G's Special

19   Liability Group, sent urgent requests for records to others within USF&G.  (*Id.* ¶¶ 23-26,

20   Ex. V-Y.)  By August 29, 2018, USF&G had located "copies of policy documents" for

21   one of the policies "within a couple of claim files," was "expecting two additional claim

22   //

1    files," and was "still working on" locating more information.  (12/3/21 Ackel Decl. ¶ 32,

2    Ex. EE.)

3           Over USF&G's objection, the King County Superior Court approved the covenant

4    judgment as reasonable on December 26, 2018.  (*Id.* ¶ 28, Ex. AA ("Reasonableness

5    Order") at 17.)  Although USF&G appealed the determination, it paid the Ulbrichts $2.5

6    million as indemnification for PM Northwest's bodily injury liability on May 1, 2019,

7    contending that the amount represented "the total potential limits available for all of the

8    policies . . . that are alleged to have been issued to PM Northwest by USF&G."  (12/3/21

9    Ackel Decl. ¶ 30, Ex. CC.)  The court of appeals affirmed the reasonableness

10   determination on February 10, 2020.  (12/3/21 Ackel Decl. ¶ 31, Ex. DD.)

11          USF&G initiated this action on March 6, 2020, seeking a declaratory judgment

12   that the total available limits of liability under any policies PM Northwest held with

13   USF&G are $2.5 million; that it had exhausted that amount by its May 1, 2019 payment

14   to the Ulbrichts and had no liability in excess of that amount; and that it neither acted in

15   bad faith nor violated IFCA through its handling of PM Northwest's insurance claim.

16   (Compl. ¶¶ 31-49.)  Defendants subsequently brought suit in federal court, which was

17   consolidated with USF&G's declaratory judgment action.  (9/21/20 Order (Dkt. # 16).)

18   Defendants' suit alleges that USF&G breached its duty to defend and indemnify; denied

19   coverage in bad faith and in violation of its enhanced obligation of fairness towards its

20   insured; and violated the Washington Insurance Fair Conduct Act ("IFCA") and the

21   Washington Consumer Protection Act ("CPA").  (SAC ¶¶ 4.1-8.2.)

22   //

ORDER - 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# III.   ANALYSIS

The court begins by addressing Defendants' motion to seal before turning to its analysis of the parties' cross motions for summary judgment. The court concludes by discussing Defendants' motion to realign the parties.

## A.   Defendants' Motion to Seal Materials Relied on in Opposition to USF&G's Motion for Summary Judgment

Defendants move to seal portions of the depositions of Cara Corson and Sherry Bowers, as well as seven exhibits used in connection with those depositions (12/6/21 Ackel Decl. (Dkts. ## 100 (sealed), 101 (redacted)) ¶¶ 12-15, 17-21, Exs. K-N, P-T); portions of their opposition to USF&G's motion for summary judgment (Dkt. # 96); and the declaration of Mark Hatley filed in support of Defendants' opposition brief (Hatley Decl. (Dkts. ## 98 (sealed), 99 (redacted)). (Seal Mot. at 2; Seal Resp. at 2.) Defendants also confirm that the parties met and conferred about the need to seal these records prior to filing the motion, as required by the local rules. (*See* Ackel Decl. ISO Seal Mot. (Dkt. # 95) ¶ 2.) USF&G joins the motion and further clarifies that it "is not seeking to maintain the confidentiality of the statements" in Defendants' opposition brief or the declaration of Mark Hatley and has also "agreed to remove the 'Confidential Material' designation" for some portions of the Corson and Bowers depositions that Defendants have requested to seal. (Seal Resp. at 2.) Defendants subsequently filed unredacted versions of their response to USF&G's summary judgment motion (Dkt. # 112) and the Hatley Declaration (Dkt. # 113). Accordingly, the parties only seek to seal the exhibits included in the Ackel Declaration through this motion.

1    USF&G, as the party asserting a confidentiality interest in the records Defendants

2    propose to seal, bears the burden of providing compelling reasons to seal the documents.

3    *See* Local Rules W.D. Wash. LCR 5(g)(3).  To meet that burden, USF&G argues that

4    sealing is necessary to protect its "proprietary computer search and indexing information,

5    as well as internal office protocols," which it believes provide it with "a competitive

6    advantage through the development and maintenance of the indexing systems and

7    documents reflecting the use of these systems."  (Seal Resp. at 4 (citing Oestman Decl.

8    (Dkt. # 110) ¶ 4).)  Disclosure of such information would, USF&G testifies, "give its

9    competitors a look into how USF&G conducts its business and," thereby, "create a

10   competitive disadvantage."  (Oestman Decl. ¶ 3.)  On this showing, the court finds that

11   USF&G has provided "compelling reasons" to overcome the presumption in favor of

12   judicial access for those records over which USF&G continues to assert a confidentiality

13   interest.  *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

14   Accordingly, the court GRANTS Defendants motion to seal in part and DENIES it

15   in part.  The motion is GRANTED with respect to the sealed exhibits attached to the

16   Ackel Declaration (Dkt. # 100) and it is DENIED as moot as to all other currently sealed

17   documents.  The Clerk is further DIRECTED to STRIKE (1) Defendants' response to

18   USF&G's motion for summary judgment (Dkts. ## 96 (sealed); 97 (redacted)) and (2)

19   Mr. Hatley's Declaration (Dkts. ## 98 (sealed); 99 (redacted)), as those filings have been

20   replaced by unredacted versions (*see* Dkts. ## 112 and 113).  To the extent Mr. Ackel's

21   redacted declaration (Dkt. # 101) shields material over which USF&G no longer asserts

22   //

1   a confidentiality interest (*see* Seal Resp. at 3), Defendants are ORDERED to file an

2   amended redacted declaration within seven (7) days of the entry  of this order.[5]

3   **B.    Summary Judgment Motions**

4           USF&G moves for summary judgment in its favor on the ground that Defendants

5   "cannot establish the material terms of the USF&G policies," and so, in turn, they

6   "cannot establish a contractual right to coverage under the policies, or bad faith claims as

7   a result of USF&G's claim handling."  (USF&G MSJ at 6.)  Defendants oppose

8   USF&G's motion (USFG&G MSJ Resp.) and also cross-move for partial summary

9   judgment in their own favor on the following:  (1) USF&G issued policy 1CCC70507 to

10  PM Northwest, which covered the Ulbrichts's claims in the underlying action; (2)

11  1CCC70507 included a duty for USF&G to defend PM Northwest in the underlying

12  action; (3) the duty to defend did not expire until USF&G paid the Ulbrichts an amount

13  equal to the policy limit on May 1, 2019; (4) 1CCC70507 included a Supplemental

14  Payments clause that obligated USF&G to pay post-judgment interest, which USF&G

15  breached by failing to pay Defendants the accrued amount of $171,172.60; and (5)

16  USF&G's breach of its duty to defend PM Northwest was unreasonable and amounted to

17  bad faith such that USF&G should be estopped from denying coverage for the unsatisfied

18  balance of the $4.5 million covenant judgment.  (Defs. MSJ at 2-3.)

19  //

20

21

22

---

[5] The court has only relied on unredacted material in this order and so does not find it necessary to direct the Clerk to provisionally file this order under seal.  To the extent the parties believe this order contains confidential material, they should move, jointly if possible, to have this order sealed within seven (7) days of the entry of this order and attach to their motion a proposed redacted version of this order.

Below, the court sets out the standard of review that applies to its consideration of cross-motions for summary judgment; considers whether Defendants are barred under Fed. R. Evid. 1004 from reconstructing the missing policies; and determines the burden of proof that Defendants face when reconstructing a missing insurance policy.  It then turns to consider the parties' remaining arguments in favor of their respective summary judgment motions.

1.    Summary Judgment Legal Standard

Summary judgment is appropriate if the evidence viewed in the light most favorable to the non-moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

1    meets its burden of production, the burden then shifts to the nonmoving party to identify

2    specific facts from which a factfinder could reasonably find in the nonmoving party's

3    favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.  Where cross motions are at

4    issue, the court must "evaluate each motion separately, giving the nonmoving party in

5    each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las*

6    *Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted); *see also Burrows v. 3M*

7    *Co.*, No. C19-1649RSL, 2021 WL 1171999, at *2 (W.D. Wash. Mar. 29, 2021).

8         Finally, "the determination of whether a given factual dispute requires submission

9    to a jury must be guided by the substantive evidentiary standards that apply to the case."

10   *Anderson*, 477 U.S. at 255.

11        2.    Reconstruction of the Missing Policies

12        Before analyzing whether Defendants have met their burden to prove the existence

13   of material policy terms, the court first considers USF&G's argument that Defendants are

14   absolutely barred from reconstructing the USF&G policies because the court in the

15   underlying action found there was "substantial evidence" that PM Northwest

16   intentionally destroyed records of its asbestos liability.  (*See* USF&G MSJ Reply at 4

17   (first citing *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1321 (9th Cir. 1986); and then citing

18   Fed. R. Evid. 1004(a))[6]; *see also* Defs. MSJ Resp. at 2-5.)  The gravamen of USF&G's

19   //

20   
21        [6] Arguments raised for the first time in a reply brief are ordinarily deemed to have been
     waived. *See Clearly Food & Beverage Co. v. Top Shelf Beverages, Inc.*, 102 F. Supp. 3d 1154,
     1165 (W.D. Wash. 2015).  The court considers the argument here because USF&G also raised it
22   in opposition to Defendants' motion for partial summary judgment.  (*See* Defs. MSJ Resp. at
     2-5.)

1    argument is that "[p]reviously, the Ulbrichts argued that PM Northwest intentionally lost

2    or destroyed its business records with knowledge of its asbestos exposure.  Now the

3    Ulbrichts argue PM Northwest innocently lost or destroyed its business records.  The two

4    positions are in fundamental conflict," and so Defendants should be estopped from

5    arguing the policies are missing and barred from attempting to reconstruct them.  (*See*

6    USF&G MSJ Reply at 4; Defs. MSJ Resp. at 2-5.)

7         Even a cursory review of the underlying action reveals that the spoliation motion

8    brought by the Ulbrichts in that action was "referencing different business records

9    destroyed at different times."  (Defs. MSJ Reply at 4.)  In the underlying action, the

10   Ulbrichts alleged the destruction by PM Northwest of "work records"—not insurance

11   policies—relating to "its asbestos liabilities."  (*See* Reasonableness Order at 5; *see also*

12   12/6/21 Brownstein Decl. (Dkt. # 92) ¶ 2, Ex. A ("Spoliation Motion") at 6 (describing

13   the allegedly spoliated documents as showing "the work or jobs that [PM Northwest] did

14   in the 1970s or 80s").)  Because the issues are unrelated, USF&G's estoppel argument

15   has no merit.  Rather, the court finds that the USF&G policies are "lost or destroyed, and

16   not by the proponent acting in bad faith."  Fed. R. Evid. 1004.  Accordingly, Defendants

17   are permitted to attempt reconstruction of the missing insurance policies.

18        3.    Burden of Proof for Establishing the Terms of Missing Policies

19        Although the parties agree that Defendants bear the initial burden of proving the

20   terms of the missing policies, they disagree about what standard they must meet.

21   (USF&G MSJ at 7; USF&G MSJ Resp. at 7.)  USF&G contends that Defendants must

22   prove the terms of the missing policies by "clear, cogent and convincing evidence."

1    (USF&G MSJ at 7.)  Defendants, by contrast, argue that the normal "preponderance of

2    evidence" standard applies and that, once met, the burden shifts to USF&G to provide

3    evidence of an applicable exclusionary policy.  (USF&G MSJ Resp. at 7, 10.)

4         The law in Washington[7] is that "[t]he burden of proof is on the insured to show

5    that a loss falls within the terms of the policy.  Once the insured has sustained that

6    burden, then the burden shifts to the insurer to prove that the loss is not covered because

7    of exclusionary provisions within the policy."  *City of Tacoma v. Great Am. Ins.*

8    *Companies*, 897 F. Supp. 486, 487 (W.D. Wash. 1995).  "Thus, the [insured] has the

9    burden of proving all elements of coverage, including the monetary value of coverage."

10   *Id.* at 488.

11        USF&G relies on cases addressing "lost instruments," generally, which hold that

12   "[t]o establish a lost instrument, the evidence must be clear, cogent and convincing."

13   *See, e.g.*, *Lutz v. Gatlin*, 590 P.2d 359 (Wash. Ct. App. 1979); *Deglow v. Smith*, 459 P.2d

14   786, 786 (Wash. 1969); *Johnson v. Wheeler*, 248 P.2d 558, 560 (Wash. 1952); *Scurry v.*

15   *City of Seattle*, 104 P. 1129, 1130 (Wash. 1909).  Defendants argue that these cases are

16   inapposite because they do not specifically address lost insurance policies, though they

17   give no reason to think that insurance policies—which are "construed as contracts" under

18   Washington law, *Weyerhaeuser Co. v. Com. Union Ins. Co.*, 15 P.3d 115, 122 (Wash.

19   //

20

21   _____

[7] The parties agree that the court must look to Washington law in determining the burden
of proof that should apply.  (*See* USF&G MSJ at 7; USF&G MSJ Resp. at 8); *see also Johnston
v. Pierce Packing Co.*, 550 F.2d 474, 476 n.1 (9th Cir. 1977) (applying state law to determine
appropriate burden of proof because "[r]ules governing presumptions and burdens of proof are
generally regarded as substantive for purposes of *Erie R. R. v. Tompkins*," 304 U.S. 64 (1938)).

22

2000) (en banc), *as amended* (Jan. 16, 2001)—should be treated differently than other

kinds of contracts.  (*See* USF&G MSJ Resp. at 8.)

Defendants suggest that *City of Tacoma* "supports the use of the 'preponderance of

the evidence' standard."  (*Id.*)  In *City of Tacoma*, the parties stipulated to terms they

agreed were likely included in a missing insurance policy, including a $100,000 policy

limit.  *City of Tacoma*, 897 F. Supp. at 487.  They could not agree, however, "if the

$100,000 limit was a per occurrence limit or an aggregate limit per policy." *Id.*  The City

of Tacoma, as the insured, argued that question implicated an "exclusion from coverage"

for which the insurer had the burden of proof. *Id.*  Alternatively, the City argued that the

limit should be applied on a per occurrence basis because other policy provisions covered

limitations on an aggregate basis. *Id.*  The City moved for summary judgment in its favor

but did not present direct or circumstantial supplementary evidence in support of its

position. *See id.*  The court found that the City failed to sustain its burden to prove that

the policy limit applied on a per occurrence basis and denied summary judgment, though

it invited the City to renew its motion if it could gather "substantially more evidence."

*Id.* at 488.  The court suggested that an investigation of "the coverage custom and

practice"; analogous insurance policies; "the records of premiums paid for known

coverage by" the insured or peer entities; or records held by the State Insurance

Commissioner "might lead to evidence from which the court could ascertain the limits of

coverage under [the missing] policies." *Id.* at 488.

Defendants' argument—that the *City of Tacoma* court must have been applying "a

lesser quantum of proof than clear and convincing" because, otherwise, "none of [the

secondary] evidence would establish the specific policy language used in the missing

policy"—is unpersuasive.  (USF&G MSJ Resp. at 8.)  *City of Tacoma* is silent on the

burden of proof it was applying, but it is a stretch to assume it was applying a

preponderance standard simply because it acknowledged that circumstantial evidence

might have been used to prove the "elements of coverage," had any been provided.  *See*

*City of Tacoma*, 897 F. Supp. at 488.  Courts routinely accept that "strong circumstantial

evidence" may be used to meet a clear and convincing standard.  *See, e.g.*, *Hong v.*

*Comm'r*, 24 F.3d 246 (9th Cir. 1994); *Weil v. Comm'r*, 962 F.2d 16 (9th Cir. 1992).

More persuasive is USF&G's suggestion that the court's need for "substantially more

evidence" before it would have considered a renewed summary judgment motion

"impl[ies] a heightened standard of proof."  (USF&G MSJ Reply at 3.)

Defendants' further argument that "the reasons behind the common law rule

requiring 'clear and convincing' evidence of a lost document are not present here" is

similarly unpersuasive.  (USF&G MSJ Resp. at 9 (citing *Powers v. Hastings*, 612 P.2d

371 (Wash. 1980) (en banc) and *Est. of Brownfield ex rel. Schneiter v. Bank of Am., N.A.*,

285 P.3d 886 (2012)).)  In *Powers*, the Washington Supreme Court found that the lessees

had "clearly" established the existence of an oral lease-purchase agreement but

nevertheless asserted that a weaker evidentiary showing would have sufficed to

"establish[] the agreement" and to "excus[e] application of the statute [of frauds]" since

the plaintiff sought legal damages rather than specific performance and had provided

"sufficient evidence of part performance of the lease-option agreement."  *Id.* at 374-75.

However, the court is not aware of any cases—and Defendants cite none—applying

1    *Powers*, or its progeny, outside of the context of cases "determining if there is sufficient

2    part performance to 'remove' an oral contract for the sale or lease of real property from

3    the operation of the statute of frauds." *Id.* at 375.  Those issues are not implicated on the

4    facts before the court and so the court concludes that *Powers* is inapposite.

5         Nor does *Estate of Brownfield* support the application of a preponderance

6    standard.  Defendants contend that the court in that case "refus[ed] to apply [the] clear

7    and convincing standard to proof of the terms of a bank's signed contract of deposit."

8    (USF&G MSJ Resp. at 9.)  But the court in *Estate of Brownfield* relied on cases,

9    discussed above, that applied a "clear and convincing" standard of proof for lost

10   documents.  *Est. of Brownfield*, 285 P.3d at 890 (citing *Smyser v. Smyser*, 140 P.2d 959

11   (1943); *Johnson*, 248 P.2d at 558; *Deglow*, 459 P.2d at 786; and *Lutz*, 590 P.2d at 359).

12   Although the dissent argued that, on the facts before the court, the lost contract had not

13   been established "by clear, cogent, and convincing evidence," there is no suggestion that

14   the dissent thought the majority had adopted a less burdensome test, only that it had

15   misapplied the clear and convincing standard to the facts before it.  *See  Est. of*

16   *Brownfield*, 285 P.3d at 891 (Kulik, J., dissenting).

17        Because Defendants provide no persuasive reason to deviate from "the common

18   law rule requiring 'clear and convincing' evidence of a lost document (*see* USF&G MSJ

19   Resp. at 9), the court finds that Defendants bear the initial burden of establishing by clear,

20   cogent, and convincing evidence the material terms of the policies.  That "standard of

21   proof is a high one, requiring 'that the trier of fact be convinced that the fact in issue is

22   'highly probable.'''"  *Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 882 P.2d

1  703, 728 (Wash. 1994) (quoting *Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 853

2  P.2d 913 (Wash. 1993)).

3      4.      The Material Terms of the Policies

4          Having established that Defendants bear the burden, in the first instance, of

5  proving the material terms of the policies by clear, cogent, and convincing evidence, the

6  court now considers whether Defendants have done so.  USF&G moves for summary

7  judgment on the basis that Defendants have no evidence of the material policy terms for

8  policy numbers 1CCA56045, 1CCB12875, 1CCD17906, or MP50769 (collectively, the

9  "four policies"); that they possess incomplete evidence of policy 1CCC70507 because

10  they "have no knowledge or information regarding how many additional endorsements

11  comprised the policy, or what those endorsements might have been" (USF&G MSJ at

12  8-9; Defs. MSJ Resp. at 6-8); and that Defendants' reconstruction expert, Mark Hatley,[8]

13  gave inconsistent testimony during his deposition that undercuts his testimony on

14  reconstruction of the policies (*see* Defs. MSJ Resp. at 6-7).  Defendants oppose

15  USF&G's motion for summary judgment as to all five policies (USF&G MSJ Resp. at

16  14-17) and cross-move for partial summary judgment in their own favor on the

17  establishment of "the existence, terms and conditions" of 1CCC70507, including general

18  //

19

20      [8] USF&G does not challenge the admissibility of Mr. Hatley's testimony as an expert
    witness (*see* USF&G MSJ Reply), and the court, having reviewed his testimony and credentials,
21  finds that he is qualified, based on his knowledge and experience, to offer relevant and reliable
    expert testimony that it may consider in deciding the motions for summary judgment.  *See*
22  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004).

ORDER - 20

liability coverage and a duty to defend bodily injury claims, like the Ulbrichts's (Defs. MSJ at 9-13).

As an initial matter, and notwithstanding arguments USF&G has made in the course of summary judgment briefing,[9] it is undisputed that USF&G issued the five policies to PM Northwest (*see* Compl. ¶ 28; *see* USF&G MSJ at 14 (admitting existence of five policies)) and that each "has limits of liability of Five Hundred Thousand Dollars ($500,000)" (s*ee* Compl. ¶ 30; *see also* 12/3/21 Ackel Decl., Ex. M at 14-18).  Thus, the parties' dispute centers around whether the USF&G policies included a duty to defend PM Northwest in the underlying action and pay post-judgment interest, and excluded any provisions that would have precluded coverage under these policies.

With respect to the disputed policy terms, Defendants substantially rely on the declaration of their expert witness, Mr. Hatley, who testifies that "[t]he various documents provided to [him], when viewed *in toto*, conclusively establish the existence, material terms, and conditions of" all five of the USF&G policies.  (*See* 1st Hatley Decl. (Dkt. # 87) at 4; 2d Hatley Decl. (Dkt. # 113) at 4.)  In drawing conclusions about the terms of the four policies, Mr. Hatley drew inferences from certificates of insurance, "extracts" from an internal USF&G database containing details on policy transactions, specimen policy forms, and handwritten notes on USF&G policy documents.  (*See* 2d Hatley Decl. at 7-15.)  For the fifth policy, 1CCC70507, he reviewed those same

---

[9] In opposing Defendants' motion for partial summary judgment, USF&G appears to dispute that the five policies each contained limits of $500,000.  (*See* Defs. MSJ Resp. at 8.) However, "[a]llegations in a complaint are considered judicial admissions."  *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008).

1    materials but also had the benefit of a partial copy of the actual policy and claim

2    documents "relating to a significant bodily injury claim" stemming from workplace

3    accidents at a Shell Oil Refinery in Anacortes, Washington, which were covered under

4    policy 1CCC70507.  (1st Hatley Decl. at 8-11.)  Thus, Mr. Hatley's testimony is based on

5    more "than that the insurer used standard forms."  (USF&G MSJ at 11 (citing *Kleenit,*

6    *Inc. v. Sentry Ins. Co.*, 486 F. Supp. 2d 121, 133 (D. Mass. 2007)); Defs. MSJ Resp. at 8.)

7           Mr. Hatley testifies that the five USF&G policies would provide coverage for the

8    kinds of claims raised by the Ulbrichts in the underlying action, and included the

9    following material terms:

10          •       A duty to defend within the "Insuring Agreement";

11          •       A duty to pay all post judgment payments within the "Supplementary
                    Payments" provision, which would apply to "any interest accrued after the
12                  August 3, 2018 Entry of Judgment" in the underlying action; and

13          •       Policy limits of "$500,000 in the occurrence and aggregate as respects
                    bodily injury," however, "the bodily injury aggregate does not apply to the"
14                  Ulbrichts's claim in the underlying action.

15   (*See* 2d Hatley Decl. at 17-18; *see also* 1st Hatley Decl. at 16-17.)  He further testifies

16   that the USF&G policies "do not contain an asbestos exclusion[] or other exclusionary

17   language that would bar coverage for" the Ulbrichts's claim in the underlying action.

18   (*See* 2d Hatley Decl. at 16; *see also* 1st Hatley Decl. at 12.)

19          USF&G faults Defendants for their lack of "direct evidence regarding the lost

20   policies," as well as for Mr. Hatley's failure "to reliably link" the secondary evidence on

21   which he relies "to an actual policy" or to "to reconstruct the lost endorsements."

22   (USF&G MSJ Reply at 5-7 (emphasis omitted).)  While it is true, as Defendants concede,

1    that they have direct evidence only of policy 1CCC70507, they have marshaled

2    substantial secondary evidence, which their expert uses to testify as to the terms of the

3    missing policies.  Mr. Hatley does not suggest that any one piece of this secondary

4    evidence establishes the missing policy, but that the "various documents . . . , when

5    viewed *in toto*, conclusively establish the existence, material terms, and conditions" of

6    the five policies.  (1st Hatley Decl. at 4; 2d Hatley Decl. at 4.)  These are precisely the

7    "avenues of investigation" this court thought "might lead to evidence from which"

8    material policy terms could be ascertained.  *City of Tacoma*, 897 F. Supp. at 488; *see also*

9    52 Am. Jur. 2d Lost and Destroyed Instruments § 38 (2021) ("Sufficient proof of the

10   coverage provided by destroyed or lost policies of insurance can be provided through the

11   use of circumstantial evidence such as . . . prior claims files," or "copies of comparable or

12   predecessor policies.").  And, indeed, Defendants proffer "substantially more" of it than

13   the insured did in *City of Tacoma*.  *See City of Tacoma*, 897 F. Supp. at 488.

14        Nor is it true that Mr. Hatley fails to "reliably link" the secondary evidence, such

15   as the specimen forms, to an actual policy.  (USF&G MSJ Reply at 5-6.)  Indeed, he

16   testifies that the "specimen USF&G '1CC' forms provide the wordings, terms and

17   conditions that would be attached to USF&G CGL Policy Nos. [1CCA56045,

18   1CCB12875, and 1CCD17906]," and that the Insurance Services Office ("ISO") forms he

19   reviewed "provid[e] the policy wording, terms and conditions for Policy no MP 50769."

20   (2d Hatley Decl. at 6-7.)  He also explains how the declarations page of policy

21   1CCC70507, which indicates that it "renews" policy 1CCB12875 (*see* 12/3/21 Ackel

22   Decl. ¶ 27, Ex. Z), provides "strong evidence" that 1CCC70507 and 1CCB12875 "likely

1    include[d] the same policy terms and conditions." (2d Hatley Decl. at 9.)  As even cases

2    cited by USF&G acknowledge, "the material terms of a missing policy can be established

3    through competent testimony suggesting that a later policy was probably a renewal of the

4    earlier policy." *Kleenit*, 486 F. Supp. 2d at 131.

5           USF&G also attacks the opinions Mr. Hatley offers in his declaration as in conflict

6    with the testimony he gave during his deposition as PM Northwest's designated Rule

7    30(b)(6) witness, where he "acknowledge[d] that the Defendants have no evidence of the

8    terms of the endorsements and the extent to which they modified the scope of coverage

9    provided by the Policy." (*See* USF&G MSJ Reply at 7 (citing 12/10/21 Brownstein Decl.

10   (Dkt. # 105) ¶ 2, Ex. 1 at 65-68).)  Defendants' explanation for this incongruence is that

11   Mr. Hatley's deposition admissions were the product of USF&G's instruction that he

12   should "confine his answers to only information reflected in PM Northwest's own factual

13   knowledge, and not to respond on the basis of any expert testimony that Defendants

14   might offer." (USF&G MSJ Resp. at 14 (citing 12/6/21 Ackel Decl. ¶ 24, Ex. W (Mr.

15   Hatley's deposition transcript) at 13:5-14:4, 15:19-16:6.)  Of course, issues of evidentiary

16   weight and witness credibility "are reserved for the jury." *City of Pomona v. SQM N.*

17   *Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  And, viewing this dispute in the light

18   most favorable to Defendants, their explanation is sufficiently mitigating.

19          USF&G's ultimate contention—that Mr. Hatley's testimony cannot be considered

20   as anything more than an "educated guess[]" about the policy terms since he cannot

21   "account for . . . the missing endorsements" (USF&G MSJ Reply at 6-7)—is based on its

22   own speculation as to unidentified terms that might have "restricted coverage [under

1   policy 1CCC70507] to particular locations or activities." (USF&G MSJ at 10.) But that

2   speculative claim is belied by evidence showing that PM Northwest previously obtained

3   coverage under policy 1CCC70507 for a bodily injury claim related to a workplace

4   accident at an oil refinery in Anacortes, WA—*i.e.*, a similar claim arising from a nearly

5   identical location. (*See* 12/3/21 Ackel Decl. ¶¶ 26-27, Exs. Y-Z; *see also id.* ¶ 29, Ex.

6   BB ("Oestman Depo. Tr.") at 71:17-25.) Moreover, Mr. Hatley testifies that neither the

7   policies, nor the specimen forms he interprets, "contain an asbestos exclusion[] or other

8   exclusionary language that would bar coverage for the *Ulbricht* claim." (*See* 1st Hatley

9   Decl. at 12; 2d Hatley Decl. at 16.)

10          Considering all of this evidence, and construing it in the light most favorable to

11   Defendants, a reasonable jury could conclude that the Ulbrichts's claim clearly fell

12   "within the terms of the [USF&G] policy," *City of Tacoma*, 897 F. Supp. at 487, and that

13   it is "highly probable" that the USF&G policies included the terms Mr. Hatley contends

14   were included. *See Queen City Farm*, 882 P.2d 728; (2d Hatley Decl. at 16-18; *see also*

15   1st Hatley Decl. at 12, 16-17). In light of this conclusion, the burden "to prove that the

16   loss is not covered because of exclusionary provisions within the policy" shifts to

17   USF&G, *City of Tacoma*, 897 F. Supp. at 487, which presents no evidence to support its

18   speculation that exclusionary terms limited coverage. (*See generally* USF&G MSJ;

19   USF&G MSJ Reply.)

20          Defendants have also moved for summary judgment on the existence and terms of

21   1CCC70507, including a duty to defend. USF&G's principal attack on Defendants'

22   motion is that Mr. Hatley's declaration testimony—which comprises a significant portion

1    of Defendants' overall presentation—is substantially undercut by the conflicting

2    testimony he gave during his deposition as PM Northwest's designated Rule 30(b)(6)

3    witness.  (*See* Defs. MSJ Resp. at 7.)  USF&G specifically highlights Mr. Hatley's

4    acknowledgement that Defendants:  cannot produce a complete copy of 1CCC70507; do

5    not know all of the terms and conditions of the policy; cannot say whether endorsements

6    to the policy would have precluded coverage for the Ulbrichts's claims in the underlying

7    action; cannot say for sure whether hand-written notations on policy documents are

8    applicable or extraneous; and cannot dismiss the possibility that there are additional

9    policy parts that would affect the scope of coverage.  (Defs. MSJ Resp. at 7 (citing

10   12/6/21 Brownstein Decl. ¶ 5, Ex. D (Mr. Hatley's deposition transcript) at 56-57, 65-66,

11   69-71, 73, 84).)

12        As noted above, Defendants contend that these admissions are the product of

13   USF&G's instructions limiting the scope of Mr. Hatley's deposition testimony as PM

14   Northwest's Rule 30(b)(6) designee and not inconsistencies in his understanding of key

15   topics.  (USF&G MSJ Resp. at 14 (citing 12/6/21 Ackel Decl., Ex. W at 13:5-14:4,

16   15:19-16:6).)  Defendants fail to respond to this argument in their reply in support of their

17   own partial summary judgment motion.  (*See generally* Defs. MSJ Reply.)  Construing

18   the evidence in the light most favorable to USF&G, a reasonable juror could find that this

19   testimony—which speaks to what PM Northwest understood about its coverage and the

20   reliability of Defendants' key reconstruction witness—sufficiently undermines the weight

21   of Mr. Hatley's reconstruction efforts such that Defendants are unable to prove that the

22   Ulbrichts's claim was clearly and convincingly covered by the USF&G policies,

1  including 1CCC70507.  *See Deglow*, 459 P.2d at 786; *SQM N. Am. Corp.*, 750 F.3d at

2  1044 (noting that "[c]hallenges that go to the weight of the evidence" or "credibility

3  determinations . . . are reserved for the jury").

4       For the reasons explained above, USF&G's motion for summary judgment on

5  Defendants' inability to establish the material terms of the USF&G policies by clear and

6  convincing evidence is DENIED.  Likewise, Defendants' motion for partial summary

7  judgment on the existence and terms of 1CCC70507, including a duty to defend and to

8  pay post-judgment interest, is also DENIED.

9       5.    USF&G's Alleged Breach of Contractual Duties

10      Defendants allege that the USF&G policies encompassed duties to defend PM

11  Northwest in the underlying action and to pay post-judgment interest on the covenant

12  judgment.  (SAC ¶¶ 4.1-4.2.)  USF&G moves for summary judgment, arguing that

13  Defendants cannot establish any duties through the certificates of insurance and so

14  USF&G cannot be in breach.  (USF&G MSJ at 15.)  Defendants cross-move for partial

15  summary judgment on their breach claims and further argue that the duty to defend did

16  not end when the stipulated judgment was entered.  (Defs. MSJ at 13-17.)  The court

17  considers USF&G's arguments first before turning to consider Defendants' arguments.

18           a.    Breach of the Duty to Defend[10]

19      Courts in Washington "have long held that the duty to defend is different from and

20  broader than the duty to indemnify."  *Am. Best Food, Inc. v. Alea London, Ltd.*, 229 P.3d

21  _____

22      [10] In its header, USF&G also references Defendants' claims concerning the duty to
   indemnify and enhanced duties of fairness.  (*See* USF&G MSJ at 15.)  It does not address them

693, 696 (Wash. 2010) (en banc), *as corrected on denial of reconsideration* (June 28, 2010).  "The duty to defend generally is determined from the 'eight corners' of the insurance contract and the underlying complaint." *Expedia, Inc. v. Steadfast Ins. Co.*, 329 P.3d 59, 64–65 (2014), *as corrected* (Aug. 6, 2014).  It is "triggered if the insurance policy *conceivably covers* allegations in the complaint." *Am. Best Food*, 229 P.3d at 696.  Thus, while an insurer "is entitled to investigate the facts and dispute the insured's interpretation of the law," it is obligated to defend its insured "if there is any reasonable interpretation of the facts or the law that could result in coverage." *Id.*

"[E]xceptions to the [eight corner] rule . . . are narrow and favor the insured." *City of Bothell v. Berkley Reg'l Specialty Ins. Co.*, No. C14-0791RSL, 2014 WL 5110485, at *8 (W.D. Wash. Oct. 10, 2014).  For instance, "[i]f coverage is not clear from the face of the complaint but coverage could exist, the insurer must investigate and give the insured the benefit of the doubt on the duty to defend." *Expedia*, 329 P.3d at 65.  Some courts have also "permitted the insurer to investigate whether the claimant is actually an insured under the policy and to rely on their findings when rejecting a tender." *City of Bothell*, 2014 WL 5110485, at *8; *see also Allstate Prop. and Cas. Ins. Co. v. A.R.*, C13–6041RBL, 2014 WL 3579672, at *5-6 (W.D. Wash. July 21, 2014) (holding that it was not a breach of the duty to defend for insurer to "mak[e] a threshold determination of who is an insured under the policy"); Allan D. Windt, 1 Insurance Claims & Disputes, § 4.5

//

---

further in its summary judgment motion or reply brief (*see generally id.*; USF&G MSJ Reply), however, so the court does not consider whether USF&G is entitled to summary judgment on those claims.

1    (5th ed. 2010) ("Before the general principle regarding the duty to defend applies, it must

2    be shown that the person claiming coverage is, in fact, an insured.  The insurer

3    has . . . not imposed upon itself a duty to defend a complete stranger to the contract.").

4         In this case, although the actual policies were missing at the time PM Northwest

5    tendered the lawsuit to USF&G, PM Northwest sent certificates of insurance on July 10,

6    2018.  (*See* 12/3/21 Ackel Decl., Ex. M at 1-2.)  USF&G tries to diminish these

7    certificates as showing nothing more than "the insured's promise to establish the policy

8    terms at some future date" (USF&G MSJ Reply at 10) but, in fact, they contained the

9    policy number; names of the insurer and insured; the dates on which the policies expired;

10   a description of the type of insurance; and the limits of bodily injury liability.  (*See*

11   12/3/21 Ackel Decl., Ex. M at 14-18.)  With that quantity of information in hand,

12   USF&G could have certainly undertaken a defense of PM Northwest, even under a

13   reservation of rights, without fear that it would be "impos[ing] upon itself a duty to

14   defend a complete stranger to the contract."  Windt, *supra* § 4.5.

15        In opposing Defendants' motion for partial summary judgment, USF&G repeats

16   many of the same arguments it advanced in support of its own motion, which the court

17   has now rejected, but also points to:  (1) the deposition of Mr. Quimby and (2) the expert

18   opinion testimony of Mr. Windt.  (*See* Defs. MSJ Resp. at 8-9.)  The court, however,

19   concludes that this testimony is insufficient to create a genuine dispute of material fact.

20        Mr. Quimby merely testifies that, when he spoke with Ms. Huntley in July 2018,

21   he didn't "have information with respect to any policies that may have been issued to PM

22   Northwest," so USF&G had "not determined any obligation" that it might have had in the

1  underlying action.  (11/16/21 Brownstein Decl. ¶ 11, Ex. 10 at 89:4-11.)  But it is

2  undisputed that Mr. Quimby had the certificates of insurance (*see* 12/3/21 Ackel Decl.,

3  Ex. N (acknowledging receipt of certificates)), and that the certificates of insurance

4  contained the policy number; names of the insurer and insured; the dates on which the

5  policies expired; a description of the type of insurance; and the limits of bodily injury

6  liability.  (*See* 12/3/21 Ackel Decl., Ex. M at 14-18.)  Thus, Mr. Quimby's testimony

7  does not actually "contradict facts specifically attested by" Defendants, and so the court

8  need not accept his testimony as true or find that it creates a triable issue of fact.  *See*

9  *Clean Crawl, Inc. v. Crawl Space Cleaning Pros, Inc.*, 364 F. Supp. 3d 1194, 1203-04

10 (W.D. Wash. 2019).

11      Mr. Windt testifies that "it was reasonable for USF&G not to provide PM

12 Northwest a defense after USF&G received the certificates of insurance on July 10,

13 2018" because "[o]ne cannot tell from the certificates what the terms and conditions of

14 the policies were."  (11/16/21 Ackel Decl. (Dkt. # 69) ¶ 3, Ex. B at 4 (capitalization

15 omitted).)  Within the context of Mr. Windt's report—and drawing all inferences in

16 USF&G's favor—it is nevertheless obvious that Mr. Windt means that the certificates do

17 not provide a complete picture of the policy terms and conditions, not that literally no

18 information can be gleaned from them.  (*Compare id.*, *with* 12/3/21 Ackel Decl., Ex. M at

19 14-18 (collecting the five insurance certificates).)  He acknowledges, for instance, that

20 the certificates at least included the policy numbers.  (*See* 11/16/21 Ackel Decl., Ex. B

21 ¶ 19(a).)  Thus, Mr. Windt's testimony does nothing to raise a disputed material fact

22 because, even if the certificates fail to tell the entire story, it is plain that they say enough

1  about what the USF&G policies conceivably covered to have triggered USF&G's duty to

2  defend PM Northwest in the underlying action.  *Am. Best Food*, 229 P.3d at 696.

3       Nor does Mr. Windt's opinion testimony that USF&G behaved reasonably in

4  denying PM Northwest a defense, notwithstanding its awareness of the certificates,

5  change the outcome.  Although Mr. Windt is permitted to offer his opinion (12/20/21

6  Order (Dkt. # 111) at 11), his "[c]onclusory, non specific statements" about USF&G's

7  legal obligation is insufficient to create a triable issue of fact.  *See Clean Crawl*, 364 F.

8  Supp. 3d at 1204 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990)).

9       For the reasons given above, USF&G's motion for summary judgment on

10  Defendants' claim for breach of the contractual duty to defend is DENIED and

11  Defendants' motion for partial summary judgment that USF&G breached the duty to

12  defend contained in policy 1CCC70507 is GRANTED.

13         *b.*    *Duration of Duty to Defend*

14       Defendants further argue that USF&G not only had a duty to defend PM

15  Northwest in the underlying action, but that the duty continued "even after the Stipulated

16  Judgment was entered" until the earlier of the judgment becoming final or the policy

17  limits being paid out by USF&G.  (Defs. MSJ at 15.)  Specifically, Defendants point to

18  costs incurred by both PM Northwest and the Ulbrichts in defending the reasonableness

19  of the covenant judgment, which they argue was necessary to ensure PM Northwest

20  benefitted from the agreement, contained in the covenant judgment, that the Ulbrichts

21  would make no claims against PM Northwest's assets.  (*See id*. at 16.)  USF&G makes

22  two arguments in response:  (1) the parties' settlement of the underlying action left only

1    the amount of the covenant judgment contingent upon a reasonableness determination,

2    and thus the Ulbrichts's release of their claims against PM Northwest was not at issue;

3    and (2) even if the duty to defend was not extinguished by the settlement, USF&G had no

4    obligation to pay for the fees identified by Defendants.  (*See* Defs. MSJ Resp. at 10.)

5          Once a duty to defend is triggered, "[a]n insurer must accordingly defend its

6    insured until it is clear that a claim is not covered under the policy." *Expedia*, 329 P.3d at

7    64.  Courts in Washington have additionally held that "where there are reasonable

8    grounds to believe a substantial interest of the insured may be served or protected

9    thereby, absent an express provision to the contrary, the insurer's duty to defend includes

10   the duty to seek postjudgment relief." *Truck Ins. Exch. of Farmers Ins. Grp. v. Century*

11   *Indem. Co.*, 887 P.2d 455, 459 (Wash. Ct. App. 1995).

12         The settlement reached between the Ulbrichts and PM Northwest included a

13   release of the claims against PM Northwest, as well as a guarantee that the Ulbrichts

14   would never seek to enforce the judgment against PM Northwest's assets.  (*See* 12/3/21

15   Ackel Decl., Ex. S ¶¶ 4(c), (d).)  Contrary to USF&G's contention, these guarantees

16   were—like the ultimate amount of the judgment—contingent upon the court in the

17   underlying action determining that the settlement was reasonable.  (*See id.* ¶ 4(e)

18   (discussing treatment of settlement admissions "[i]n the event the Court rejects the

19   stipulated judgment or *any part of the Settlement Agreement*, in full or in part." (emphasis

20   added)).)  In light of that risk, there were "reasonable grounds" for USF&G to believe

21   that PM Northwest's "substantial interest[s]" were served by the pursuit of post-judgment

22   //

1    relief in the form of an order determining the settlement between the parties was

2    reasonable.  *See Truck Ins. Exch.*, 887 P.2d at 459.

3           Accordingly, USF&G's duty to defend continued up until it made a payment of

4    $2.5 million to the Ulbrichts on May 1, 2019.  Thus, the duty to defend would have

5    applied to expenses incurred by PM Northwest in pursuit of a reasonableness

6    determination, including costs associated with the deposition of its attorney, Mr. Shaw.

7    USF&G's argument that expenses incurred by PM Northwest in connection with Mr.

8    Shaw's deposition should not be covered because he purportedly appeared as a fact

9    witness is unavailing.  (Defs. MSJ Resp. at 10.)  USF&G does not expand on this

10   assertion but whether Mr. Shaw appeared as the deponent or the attorney defending the

11   deponent is immaterial to this inquiry; all that matters is that the expense served PM

12   Northwest's interests in securing a reasonableness determination.  USF&G makes no

13   argument the deposition testimony did not and so this argument is rejected.  (*See id.*)

14          USF&G is correct, however, that it should not be liable for any post-judgment

15   expenses incurred by the Ulbrichts.  (*Id.*)  The Ulbrichts's rights against USF&G are

16   defined by PM Northwest's assignment of its interests in the settlement agreement, and

17   that assignment expressly reserved to PM Northwest "any claims for its attorney fees and

18   costs."  (*See* 12/3/21 Ackel Decl., Ex. S ¶ 4(b).)

19          Thus, USF&G's liability for breaching its duty to defend extended beyond entry of

20   the covenant judgment and to the date of its $2.5 million payment to the Ulbrichts, but its

21   liability for this post-judgment breach does not include any post-judgment expenses

22   incurred by the Ulbrichts.

1                      c.        *Breach of Duty to Pay Post-Judgment Interest*

2              Defendants also argue that the USF&G policies include a Supplemental Payments

3    provision, which "require[s] an insurer to pay all interest accrued on the entire amount of

4    the judgment, even if the amount of the judgment exceeds the insurer's limits of

5    liability." (Defs. MSJ at 17.)  USF&G, Defendants contend, "has thus far refused to pay

6    anything towards the accrued interest" and therefore "owes at least $171,172.60" in

7    interest on the $4.5 million covenant judgment.  (*Id.*)  However, the record in this case

8    shows that on May 22, 2019 Defendants filed a notice of partial satisfaction of judgment

9    with the court in the underlying action in which it represented that USF&G had "issued

10   payment of post-judgment interest on the partial satisfaction up through the delivery of

11   payment on May 2, 2019, totaling $171,172.60."  (*See* 12/10/21 Brownstein Decl. ¶ 4,

12   Ex. 3 ("Notice of Partial Satisfaction of Judgment").)  This not only met USF&G's

13   alleged obligation to pay post-judgment interest on the covenant judgment but also "cut

14   off the running of its obligation to pay post judgment interest."  (*See* 12/3/21 Ackel Decl.

15   ¶ 33, Ex. FF at 2.)

16             Thus, even if Defendants are able to prove at trial that the USF&G policies

17   included a Supplementary Payment provision that contemplated the payment of

18   post-judgment interest, USF&G has complied with that term.  Accordingly, there has

19   been no breach and Defendants' motion for partial summary judgment on this issue is

20   DENIED.

21   //

22   //

ORDER - 34

1

6.    Bad Faith and Coverage By Estoppel

2      Defendants allege that USF&G's denial of coverage—by refusing to offer PM

3 Northwest a defense—without a reasonable investigation "into whether it had issued the

4 five CGL insurance policies reflected in the Certificates of Insurance received by

5 [USF&G] on July 10, 2018," and without "giv[ing] equal consideration" to PM

6 Northwest's interest in coverage, was bad faith.  (SAC ¶¶ 5.2, 6.8.)  All insurers owe

7 their insureds a general duty of good faith, which imposes a "broad obligation of fair

8 dealing," *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 667-68 (Wash.

9 2008) (en banc), and requires insurers to not refuse to defend their insured for

10 "unreasonable, frivolous, or unfounded" reasons, *see Xia v. ProBuilders Specialty Ins.*

11 *Co.*, 400 P.3d 1234, 1239 (Wash. 2017).  *See also Am. Best Food*, 229 P.3d at 696

12 (holding that insurer's refusal to defend insured "based upon an arguable interpretation of

13 its policy was unreasonable and therefore in bad faith").  Moreover, "[i]n deciding

14 whether to defend, an insurer may not put its own interest above that of its insured," or

15 "give itself the benefit of the doubt rather than its insured."  *Am. Best Food*, 229 P.3d at

16 700-01.  Where doubts linger, insurers are counseled to "defend under a reservation of

17 rights" and to simultaneously "seek declaratory relief to establish that its policy excludes

18 coverage." *Id.*

19      The parties have cross-moved for summary judgment on the bad faith issue, which

20 cuts across Counts IV, V, and VI of Defendants' second amended complaint.  (*See* SAC

21 ¶¶ 4.1-6.8.)  USF&G argues that summary judgment in its favor is appropriate because:

22 (1) the Washington insurance regulation Defendants cite in the second amended

1   complaint, WAC 284-30-330(4), imposes no duty to investigate; (2) its investigation to

2   locate the missing policies was reasonable and not done in bad faith; and (3) the

3   certificates of insurance do not create a duty to defend, and so it could not have breached

4   any duties unreasonably.  (*See* USF&G MSJ at 12-15; USF&G MSJ Reply at 8-11.)

5   Defendants also move for summary judgment on bad faith, arguing that:  (1) USF&G's

6   search for the insurance policies was unreasonable, in part, because it violated various

7   Washington insurance regulations; and (2) the certificates of insurance provided USF&G

8   "sufficient evidence . . . that coverage conceivably applied to the Ulbricht claim to

9   require it to offer PM Northwest a defense."  (Defs. MSJ at 17-24.)  Defendants also seek

10  summary judgment on their request for the application of the remedy of coverage by

11  estoppel.  (*See* Defs. MSJ at 17-24; USF&G MSJ Resp. at 20-23.)

12          The court considers each argument in turn.

13                  a.      *Applicability of Washington Insurance Regulations to USF&G's*
                            *Policy Search*

14

15          It is clear that a violation of the standards set forth in "WACs 284–30–300 through

16  –800 . . . constitutes a breach of the insurer's duty of good faith."  *Rizzuti v. Basin Travel*

    *Serv. of Othello, Inc.*, 105 P.3d 1012, 1019 (Wash. Ct. App. 2005); *Naxos, LLC v. Am.*

17  *Fam. Ins. Co.*, No. C18-1287JLR, 2020 WL 777260, at *20 (W.D. Wash. Feb. 18, 2020).

18  The Washington Supreme Court has further emphasized, citing to those same provisions

19  of the WAC, that "[u]nder Washington law every insurer has a duty to act promptly, in

20  both communication and investigation, in response to a claim or tender of defense."  *St.*

21  *Paul Fire & Marine Ins.*, 196 P.3d at 668 (citing WAC 284-30-330(4), WAC

22

1    284-30-360, WAC 284-30-370, and WAC 284-30-380).  And this court has previously

2    held that WAC 284-30-330(4), in particular, is violated by an insurer's failure to

3    investigate before denying coverage.  *See Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F.

4    Supp. 2d 1227, 1239 (W.D. Wash. 2008).  Accordingly, the court finds that there is

5    ample support for the proposition that WAC 284-30-330(4) can be violated by an

6    insurer's unreasonable investigation prior to denying coverage and that such a violation

7    would amount to bad faith.[11]

8         But, even if WAC 284-30-330(4) does not encompass a duty to reasonably

9    investigate a claim prior to denying a defense, Defendants have also alleged a violation of

10   the "common law duty to act in good faith."  (SAC ¶¶ 5.2-5.4.)  Meeting this duty will

11   necessarily require some investigation by the insurer to determine "if there is any

12   reasonable interpretation of the facts or the law that could result in coverage."  *Am. Best*

13   *Food*, 229 P.3d at 696; *see also Aecon Bldgs.*, 572 F. Supp. 2d at 1236 ("[I]t is an

14   insurer's affirmative duty to investigate a claim before it denies coverage, not the

15   insured's duty to continue supplementing the record to an uninquisitive insurer." (citation

16   omitted)).  Although the insurer's investigation is generally satisfied by examining "the

17   face of the complaint and the insurance policy" to determine whether "coverage under the

18   //

19
        _____

        [11] In their motion for partial summary judgment, Defendants also argue that USF&G
20   violated WAC 284-30-360(4), WAC 284-30-370, and WAC 284-30-380(1) and (3).  (Defs. MSJ
     at 20-21.)  As USF&G rightly notes (Defs. MSJ Resp. at 16 n.6), Defendants did not allege that
21   those provisions of the WAC were violated in their second amended complaint.  (*See generally*
     SAC.)  Accordingly, the court does not consider those arguments in this order.  *See Wasco Prod.,*
     *Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary
22   judgment is not a procedural second chance to flesh out inadequate pleadings.").

1   policy" is "conceivabl[e]," *Xia*, 400 P.3d at 1239, insurers may be required to go further

2   if the circumstances of a case—and their obligation to deal fairly with their insured—

3   warrant, *see Expedia*, 329 P.3d at 65 (requiring examination beyond the traditional "eight

4   corners" where extrinsic evidence might show that "coverage could exist"); *see also City*

5   *of Bothell*, 2014 WL 5110485, at *8.

6        Accordingly, whether under WAC 284-30-330(4) or the broader common law

7   duty, an insurer's failure to reasonably investigate the legal and factual issues that might

8   give rise to coverage for its insured amounts to bad faith.

9             *b.*     *The Reasonableness of USF&G's Investigation*

10        Because the court finds that insurers are obligated to conduct a reasonable

11   investigation before denying coverage in the form of a defense, the question before the

12   court is whether USF&G's "denial of coverage was unreasonable when it occurred."

13   *Aecon Bldgs.*, 572 F. Supp. 2d at 1236.  This is a fact-intensive question that necessarily

14   invites some "fly-specking [of] the details of the search" USF&G undertook before

15   denying PM Northwest a defense.  (USF&G MSJ Reply at 10.)

16        USF&G focuses on the reasonableness of its efforts to "establish that the complete

17   terms and conditions [of the USF&G policies] would cover the claim," and notes that,

18   "[e]ven after an exhaustive search for secondary evidence, no policy has ever been

19   located and PM Northwest has no evidence to establish the entire terms or conditions of

20   any [policy]."  (USF&G MSJ at 14.)  The court agrees that USF&G expended significant

21   effort to locate the complete policy terms, including tasking increasingly specialized

22   departments to work from the information contained in the certificates to locate the actual

policies.  (*See, e.g.*, 11/16/21 Brownstein Decl. ¶ 13, Ex. 12 (forwarding the certificates

to a specialized document management department with a request for search assistance);

12/3/21 Ackel Decl., Exs. V-Y (submitting "rush" search requests to specialized offices

within USF&G).)  Whether it did so in a sensible manner and with sufficient urgency is

hotly contested (*see* USF&G MSJ Resp. at 2-3 (highlighting evidence of missteps by Ms.

Berneche); *see also* Berneche Depo. Tr. at 107:9 (stating that the matter simply "fell off

[her] radar")), as is PM Northwest's responsibility for any delays (*compare* 12/3/21

Ackel Decl., Ex. M at 4-8 (complaint filed January 24, 2018), *with id.*, Ex. J at 3 (Ms.

Huntley initiating contact with USF&G on March 27, 2018)).  It is plain that reasonable

minds could differ on whether USF&G's search for the completed policies was

reasonable or not and so summary judgment is DENIED to both parties on the issue of

whether USF&G's search for the policies was unreasonable and undertaken in bad faith.

   USF&G's focus on its efforts to locate the completed policies overlooks, however,

whether it was reasonable for it to deny PM Northwest a defense until that process had

completed.  The court thus considers whether its failure to defend on the basis of the

certificates alone was reasonable.

        *c.*  *Failure to Defend Based on Certificates of Insurance*

   Even where, as here, a court has concluded that an insurer has breached its duty to

defend its insured, a claim for the tort of bad faith requires the further showing that the

contractual breach was "unreasonable, frivolous, or unfounded."  *See Osborne Constr.*

*Co. v. Zurich Am. Ins. Co.*, 356 F. Supp. 3d 1085, 1091 (W.D. Wash. 2018).  "An insurer

acts in bad faith when it relies on an 'arguable legal interpretation of its own policy' or a

1    'questionable interpretation of law' to deny a tender of defense." *Id.* (quoting *Am. Best*

2    *Food*, 229 P.3d at 700).  However, "[a] breach of the duty to defend does not

3    automatically constitute bad faith," *Webb v. USAA Cas. Ins. Co.*, 457 P.3d 1258, 1272

4    (Wash. Ct. App. 2020) (citing *Am. Best Food*, 229 P.3d 693 n.5), and an insurer's refusal

5    to defend "'based upon a reasonable interpretation of the insurance policy,' even if that

6    interpretation is ultimately incorrect," does not constitute bad faith, *Osborne Constr. Co.*,

7    356 F. Supp. 3d at 1091 (quoting *Kirk*, 951 P.2d at 1126).

8        It is undisputed that by July 10, 2018, USF&G had copies of the certificates of

9    insurance.  (*See* 12/3/21 Ackel Decl., Ex. N.)  And while there is no dispute that the

10    certificates of insurance did not contain the complete insurance policies (*see id.*), they

11    nevertheless proved the issuance of the policies (*see* USF&G MSJ Reply at 8

12    (acknowledging that certificates proved the "issuance" of the policies")); contained

13    accurate policy numbers; named USF&G as the insurer and PM Northwest as the insured;

14    listed the dates of the policy period; and showed the limits of liability for bodily injury

15    claims (*see* 12/3/21 Ackel Decl., Ex. M at 14-18).  By July 10, 2018, USF&G also had

16    the complaint and amended complaint in the underlying action, which show that PM

17    Northwest had been sued by Mr. Ulbricht for bodily injury stemming from workplace

18    exposure to asbestos in the 1970s and 80s.  (*See id.*, Ex. M at 4-13.)  Moreover, USF&G

19    admits that it accepted that the certificates were authentic, validly issued by its agent, and

20    represented "correct copies" of the actual insurance certificates.  (*See, e.g.*, Oestman

21    Depo Tr. at 31:2-13.)  Rather, USF&G's approach was driven by its resolute view that

22    "until a complete copy of a policy is located, USF&G doesn't . . . ha[ve] any duty to

1  defend" its insured.  (*See, e.g.*, *id.* at 68:18-21.)

2          In effect, USF&G contends that, when confronted with the certificates of

3  insurance, it was unable to conceive of a scenario under which it would have extended

4  coverage and a defense to PM Northwest in the underlying action unless and until the full

5  policies could be located within its archives.  Construing these facts in favor of

6  Defendants, it is easy to conclude that a reasonable jury could find that USF&G put its

7  own interests ahead of its insured and unreasonably denied PM Northwest a defense.  *See*

8  *Am. Best Food*, 229 P.3d at 700-01.  Accordingly, USF&G's motion for summary

9  judgment on the issue of its bad faith refusal to defend PM Northwest is DENIED.

10          In opposing Defendants' motion for partial summary judgment on bad faith,

11  USF&G rehashes arguments it has raised in connection with other claims, including that:

12  PM Northwest intentionally destroyed business records and so is estopped under the best

13  evidence rule from reconstructing the missing policies; Washington insurance regulations

14  impose no obligation to investigate prior to rendering a coverage decision; its search for

15  policy records was reasonable, albeit hampered by "PM Northwest repeatedly fail[ing] to

16  provide information in its possession about the claim" and underlying action; and the

17  certificates of insurance triggered no duty to defend PM Northwest and so its decision not

18  to defend cannot have been in bad faith.  (*See* Defs. MSJ Resp. at 12-19.)

19          The results are not different when USF&G is in the position of nonmovant.  The

20  undisputed facts provide no reason to estop Defendants from reconstructing 1CCC70507.

21  (*See supra* at 15.)  And, while the court does not consider whether USF&G violated the

22  insurance regulations Defendants rely on in their partial summary judgment motion (*see*

*supra* at 37 n.11) and also finds that a genuine factual dispute exists concerning the

reasonableness of USF&G's policy search (*supra* at 39), USF&G's focus on the

reasonableness of its pursuit of the full policy documents was immaterial to its duty to

defend, given the information provided by the certificates. *St. Paul Fire & Marine Ins.*

*Co.*, 196 P.3d at 668 ("[B]ad faith claims mishandling remains actionable in the absence

of coverage.").  The question it should have asked was not whether coverage would

ultimately lie but whether the certificates, which provided evidence of the existence of

the policies and the scope of coverage, "*conceivably cover[ed]* allegations in the

complaint." *Am. Best Food*, 229 P.3d at 696.  On the undisputed facts before the court,

including a plain reading of the certificates (*see* 12/3/21 Ackel Decl., Ex. M at 14-18), no

reasonable jury could conclude that coverage was inconceivable.  (*See supra* at 31.)  And

USF&G's insistence on locating the full policies before it would consider offering a

defense to its insured reveals that it never gave PM Northwest "the benefit of any doubt

as to the duty to defend," *Am. Best Food*, 229 P.3d at 700.  As a matter of law, that

conduct is unreasonable and bad faith.  Accordingly, Defendants' motion for partial

summary judgment is GRANTED on the issue of whether USF&G's failure to defend on

the basis of the certificates was bad faith.

> d.   *Coverage by Estoppel*

    As a remedy for USF&G's bad faith, Defendants ask the court to estop USF&G

from denying coverage for the unsatisfied amount due under the covenant judgment.

(Defs. MSJ at 17.)  "[I]n the third-party context, if the insured shows by a preponderance

of the evidence the insurer acted in bad faith, there is a presumption of harm." *Mut. of*

1    *Enumclaw Ins. Co. v. Dan Paulson Const., Inc.*, 169 P.3d 1, 10 (Wash. 2007) (en banc).[12]

2    The insurer can rebut this presumption "by showing by a preponderance of the evidence

3    its acts did not harm or prejudice the insured." *Id.*  The "presumption is not rebutted

4    simply" because the insured's claims against its insurer have been assigned to the third-

5    party claimant, "coupled with a covenant not to execute judgment against the insured."

6    *Id.*  Moreover, "[w]here coverage by estoppel applies, 'the amount of a covenant

7    judgment is the presumptive measure of an insured's harm caused by an insurer's tortious

8    bad faith if the covenant judgment is reasonable.'"  *Id.* at 13 (quoting *Besel v. Viking Ins.*

9    *Co. of Wisconsin*, 49 P.3d 887, 891 (Wash. 2002) (en banc).)  "Once the covenant

10   judgment is found to be reasonable, 'the burden shift[s] to the insurer to show that the

11   settlement [i]s the result of fraud or collusion.'"  *Id.* (quoting *Truck Ins. Exch. v. Vanport*

12   *Homes, Inc.* ("*Truck Ins. Exch. I*"), 58 P.3d 276, 284 (Wash. 2002) (en banc)).  "Absent

13   such a showing, the insurer is liable even beyond the limits of the insurance policy

14   because through its bad faith, the insurer 'has voluntarily forfeited its ability to protect

15   itself against an unfavorable settlement.'"  *Id.* (quoting *Truck Ins. Exch. I*, 58 P.3d at

16   284).

17       Here, USF&G acted in bad faith by unreasonably denying PM Northwest a

18   defense when it had certificates of insurance that triggered its duty to do so and it has

19   made no showing to suggest that Defendants were not harmed by its bad faith conduct.

20   //

21   ───────────────

[12] Third-party coverage is that which "indemnif[ies] an insured for covered claims which others
[third-party claimants] file against him." *Mut. of Enumclaw Ins.*, 169 P.3d at 7 n.8 (quoting
22   THOMAS V. HARRIS, WASHINGTON INSURANCE LAW § 1.2 (2d ed. 2006)).

*Aecon Bldgs.*, 572 F. Supp. 2d at 1238.  Nor does it contend that the covenant judgment, which has been deemed reasonable by the King County Superior Court and Washington Court of Appeals (*see* 12/3/21 Ackel Decl., Exs. AA, DD), was unreasonable or the product of fraud or conclusion.  (*See generally* Defs. MSJ Resp.)

Indeed, USF&G's only argument against the application of coverage by estoppel is that, if proved, USF&G's alleged violation of multiple insurance regulations amounts to a claim of procedural bad faith, which USF&G contends, "cannot form the basis for a substantive bad faith claim and therefore coverage by estoppel is not available."  (Defs. MSJ Resp. at 18 (citing *St. Paul Fire & Marine Ins. Co.*, 196 P.3d at 668).)  But, as described above, the court's conclusion that USF&G acted in bad faith did not hinge on its violation of insurance regulations but on its decision to ignore the obvious import of the certificates of insurance and unreasonably deny its insured a defense.  Accordingly, this argument has no relevance and Defendants' motion for partial summary judgment on the remedy of coverage by estoppel is GRANTED and USF&G is estopped from denying coverage for the unsatisfied amounts of the covenant judgment.

7.   Violation of Washington Insurance Fair Conduct Act and Consumer Protection Act

USF&G moves for summary judgment on Defendants' claims alleging violations of IFCA and the CPA as a result of USF&G "[m]isrepresenting pertinent facts or insurance policy provisions"; "[r]efusing to pay claims without conducting a reasonable investigation"; "fail[ing] to fully disclose . . . all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is

1    presented"; or "mak[ing] a payment of benefits without clearly advising the payee, in

2    writing, that it may require reimbursement, when such is the case."  (SAC ¶¶ 7.2, 8.1.)

3    USF&G argues that summary judgment is appropriate because (1) IFCA does not apply

4    to third-party insurance, and (2) even if it does apply, USF&G's conduct did not violate

5    either statute.  (USF&G MSJ at 16-17.)  The court first considers whether Defendants'

6    claims may be brought under IFCA before considering USF&G's conduct under IFCA

7    and the CPA.

8                    *a.*    *IFCA's Application to Third-Party Insurance*

9            "The purpose of IFCA is to protect individual policy holders from unfair practices

10   by their insurers."  *Trinity Universal Ins. Co. of Kansas v. Ohio Cas. Ins. Co.*, 312 P.3d

11   976, 985 (Wash. Ct. App. 2013).  To that end, it permits "[a]ny first party claimant to a

12   policy of insurance who is unreasonably denied a claim for coverage or payment of

13   benefits by an insurer" to "bring an action . . . to recover the actual damages sustained,

14   together with the costs of the action, including reasonable attorneys' fees and litigation

15   costs."  RCW 48.30.015(1).  A "first party claimant" is "an individual, corporation,

16   association, partnership, or other legal entity asserting a right to payment as a covered

17   person under an insurance policy or insurance contract arising out of the occurrence of

18   the contingency or loss covered by such a policy or contract."  *Id.* 48.30.015(4).

19           USF&G relies on *Cox v. Cont'l Cas. Co.*, No. C13-2288MJP, 2014 WL 2560433,

20   at *2 (W.D. Wash. June 6, 2014), and the Ninth Circuit's unpublished opinion affirming

21   that order, which briefly concluded that the district court "did not err in dismissing the

22   Plaintiffs' IFCA claim" because "[t]he policy in question is not a first party policy; thus,

the Plaintiffs, standing in [the insured's] shoes, cannot be a first party claimant," 703 F.

App'x 491, 497-98 (9th Cir. 2017). *Cox* is not controlling, *see* CTA9 Rule 36-3, and

other cases in this district have decided the issue differently. *See, e.g.*, *Navigators*

*Specialty Ins. Co. v. Christensen Inc.*, 140 F. Supp. 3d 1097, 1099 (W.D. Wash. 2015)

(collecting cases to illustrate the "two plausible readings" within this district of IFCA's

"first-party claimant" requirement). Because the court finds that IFCA's text does not

clearly answer whether IFCA gives a right of action to first-party claimants under a third-

party insurance contract, it joins those cases looking to IFCA's legislative history and

concluding that it does. *See, e.g.*, *id.* at 1102 ("IFCA, as written and as intended, confers

a right of action to first-party claimants whether under a first-party or third-party

insurance contract.").

Even though IFCA applies to third-party insurance contracts, absent an assignment

of rights by the first-party insured, it confers no right of action to third-party claimants

"no matter how egregious the insurer's conduct." *United States for use & benefit of*

*Ballard Marine Constr., LLC v. Nova Grp. Inc.*, No. C20-5954BHS-DWC, 2021 WL

3174799, at *4 (W.D. Wash. July 27, 2021), *clarified on denial of reconsideration*, No.

C20-5954BHS-DWC, 2021 WL 4948196 (W.D. Wash. Oct. 22, 2021); *see also Hopkins*

*v. State Farm Mut. Auto. Ins. Co.*, No. C15-2014JCC, 2017 WL 881373, at *3 (W.D.

Wash. Mar. 6, 2017) (considering legislative history and permitting IFCA claim where a

first-party claimant to a third-party automobile insurance contract assigned its rights to

plaintiff). That requirement is no obstacle here, because PM Northwest, the first-party

claimant, is a party to this IFCA action and has also assigned its insurance rights to the

1   Ulbrichts.  (*See* 12/3/21 Ackel Decl., Ex. S ¶ 4(b).)  Because Defendants are not barred

2   from asserting a claim under IFCA, *see Ballard Marine Constr.*, 2021 WL 3174799, at

3   *4, the court turns to consider whether USF&G's conduct violated IFCA or the CPA.

4                  b.      *USF&G's Conduct Under IFCA and CPA*

5          USF&G first argues that summary judgment should be granted in its favor on

6   Defendants' "IFCA and CPA claims[] alleging a failure to investigate and defend based

7   on certificates of insurance" for "the same reasons" it gave in defense of its failure to

8   defend or investigate.  (*See* USF&G MSJ at 17.)  The court has already rejected those

9   arguments, *see supra* at 31, 39, and does so again here.  That leaves the portions of

10  Defendants' IFCA and CPA claims that relate to USF&G's alleged "(i) failure to pay

11  post-judgment interest; (ii) misrepresentation of policy limits; and (iii) failure to disclose

12  that it might require reimbursement if USF&G were successful on its appeal," in

13  violation of WAC 284-30-330(1) and WAC 284-30-350(1) and (7).  (*See* SAC ¶¶ 7.2,

14  8.1; USF&G MSJ at 17.)

15         Defendants' failure to pay and misrepresentation claims both revolve around

16  USF&G's alleged failure to pay Defendants post-judgment interest on the $4.5 million

17  covenant judgment.  (*See* SAC ¶ 7.1.)  As discussed above, even if USF&G had an

18  obligation to pay post-judgment interest, it has fulfilled that obligation.  *See supra* 34.

19  Defendants cannot sustain a claim by asserting to this court that their insurer breached,

20  misrepresented, or withheld information about a policy term with which they told a

21  different court—and USF&G—USF&G had complied.  *Seaway Properties, LLC v.*

22  *Fireman's Fund Ins. Co.*, 16 F. Supp. 3d 1240, 1255 (W.D. Wash. 2014) ("The right to

1  sue [under IFCA] arises solely from an unreasonable denial of a claim for coverage or

2  payment of benefits.").  Accordingly, USF&G's motion for summary judgment is

3  GRANTED as to Defendants' claims that it violated IFCA by failing to pay post-

4  judgment interest, or making misrepresentations or omissions with respect to that alleged

5  policy benefit.  *See id.*; *see also Rinehart v. Life Ins. Co. of N. Am.*, No. C08-05486RBL,

6  2009 WL 2406333, at *3 (W.D. Wash. Aug. 4, 2009) ("A misstatement of the nature of

7  coverage may violate WAC 284–30–330, but there still must also be an injury to support

8  a claim for damages.").

9       Finally, the record is clear that USF&G did not "fail[] to clearly disclose in writing

10  that it" would have "require[d] reimbursement if the appeal reversed the ruling that the

11  settlement was reasonable."  (SAC ¶ 8.1.)  In the May 1, 2019 cover letter that

12  accompanied USF&G's $2.5 million check to the Ulbrichts, USF&G expressly stated that

13  its payment was made without waiving any rights, pending the outcome of the appeal of

14  the underlying action.  (*See* 12/3/21 Ackel Decl., Ex. CC at 1.)  In response to

15  Defendants' counsel asking whether that meant USF&G would seek "seek

16  reimbursement . . . in the event of a favorable appellate decision" (*see id.*, Ex. FF at 2),

17  USF&G clarified by email on May 10, 2019 that it did intend to "seek to recover any

18  overpayment" if it prevailed on appeal (11/16/21 Brownstein Decl. ¶ 31, Ex. 27).[13]  Thus,

19  //

20

21       [13] Defendants also seemingly understood from the May 1, 2019 letter that the $2.5
    million was encumbered by the appeal process.  (*See* 12/3/21 Ackel Decl., Ex. FF at 2 (noting
22  that USF&G's reservation of rights "leaves our clients with no ability to make use of the
    funds").)

ORDER - 48

1   there is no dispute that USF&G met its obligation to "clearly advis[e]" Defendants of that

2   intention.  *See* WAC 284-30-350(7).

3       Accordingly, USF&G's motion for summary judgment on Defendants' IFCA and

4   CPA claims is DENIED in part and GRANTED in part.  It is DENIED as to the portion

5   of Defendants' claims that relate to USF&G's bad faith breach of its duty to investigate

6   and defend its insured.  It is GRANTED as to the portion of Defendants' claims that

7   relate to USF&G's alleged (i) failure to pay post-judgment interest; (ii) misrepresentation

8   of policy limits; and (iii) failure to disclose that it would have sought recoupment of the

9   $2.5 million it paid to the Ulbrichts had it succeeded on appeal.

10          *c.      Actual Damages Under IFCA*

11      Finally, USF&G moves for summary judgment on the basis "that the covenant

12  judgment does not establish the measure of 'actual damages' for purposes of IFCA."

13  (USF&G MSJ at 19.)  IFCA does not define "actual damages."  *See generally* RCW

14  48.30.015.  However, in the context of other statutes, the Washington Supreme Court has

15  defined actual damages to "encompass all the elements of compensatory awards

16  generally."  *Rasor v. Retail Credit Co.*, 554 P.2d 1041, 1050 (Wash. 1976) (interpreting

17  the Fair Credit Reporting Act).  Thus, "[u]nder IFCA, an insurer 'is liable only for those

18  damages proximately caused by [its] IFCA violation.'"  *Schreib v. Am. Fam. Mut. Ins.

19  Co.*, 129 F. Supp. 3d 1129, 1137 (W.D. Wash. 2015) (quoting *Dees v. Allstate Ins. Co.*,

20  933 F. Supp. 2d 1299, 1312 (W.D. Wash. 2013)); *see also MKB Constructors v. Am.

21  Zurich Ins. Co.*, No. C13-0611JLR, 2015 WL 1188533, at *21 (W.D. Wash. Mar. 16,

22  2015) (requiring showing of proximate cause), *aff'd*, 711 F. App'x 834 (9th Cir. 2017).

1    Thus, the court has previously held that an arbitration award, which reflected damages

2    resulting from an "underlying motor vehicle accident," did not constitute "actual

3    damages" under IFCA because they were not "proximately caused" by the statutory

4    violations.  *Schreib*, 129 F. Supp. 3d at 1137.

5         Unlike the arbitration award at issue in *Schreib*, the covenant judgment in the

6    underlying action reflects both PM Northwest's liability exposure from a jury verdict (*see*

7    Reasonableness Order at 9 (finding that "the $4.5 million covenant judgment fall within

8    the range of judgment that Plaintiffs could have recovered from PM Northwest")) and an

9    assessment that "the risks of continued litigation to PM Northwest were especially high"

10   because USF&G declined to defend PM Northwest (*id.* at 13).  Thus, the $4.5 million

11   covenant judgment reflects both "actual damages" and damages unrelated to the conduct

12   Defendants allege violated IFCA, which means that it does not establish Defendants'

13   "actual damages" under IFCA.  *See Schreib*, 129 F. Supp. 3d at 1137.

14        Defendants argue in response that USF&G should be "bound" by the $4.5 million

15   covenant judgment because "[t]here is no reason to conclude that the unpaid amount of a

16   covenant judgment, recoverable for the bad faith breach of the duty to defend is not

17   'actual damages' recoverable under IFCA."  (USF&G Resp. at 25.)  But the cases

18   Defendants cite establish only that an insured who prevails on a bad faith claim may

19   recover beyond the policy limits, including for an award established in arbitration, *see*

20   *Bird*, 287 P.3d 551, 555-56 (Wash. 2012) (en banc); *see also Miller v. Kenny*, 325 P.3d

21   278, 292 (Wash. Ct. App. 2014), and that insureds may recover attorney and other fees

22   under IFCA where they can show those fees were proximately caused by the alleged

1   IFCA violation, *see Gosney v. Fireman's Fund Ins. Co.*, 419 P.3d 447, 480 (Wash. Ct.

2   App. 2018); *see also MKB Constructors*, 2015 WL 1188533, at *20.  Defendants thus

3   provide no support for the proposition that IFCA's damages enhancement applies to any

4   damages award—whether established through covenant judgment, bad faith action, or

5   otherwise—absent a showing that it was proximately caused by the IFCA violation.  *See*

6   *Schreib*, 129 F. Supp. 3d at 1137.

7          Because this is not a situation "in which an IFCA violation cause[d] the entirety"

8   of the injuries reflected in the covenant judgment, the court will GRANT summary

9   judgment to USF&G on the issue of whether the covenant judgment establishes

10  Defendants' "actual damages" under IFCA.  *See id.*  However, Defendants are entitled to

11  prove at trial that USF&G's alleged IFCA violations proximately caused them to incur

12  actual damages but, in doing so, will need to differentiate those damages from the amount

13  of tort liability exposure PM Northwest would have faced anyway.  *See id.*

14  **C.    Defendants' Motion to Realign the Parties**

15         Defendants ask the court to "realign the parties in this case," such that PM

16  Northwest and the Ulbrichts will be described and treated as plaintiffs and USF&G will

17  be described and treated as a defendant.  (Realignment Mot. at 2.)  The court previously

18  declined to realign the parties when it consolidated *Ulbricht, et al. v. USF&G*,

19  C20-0617TLF (W.D. Wash.) with this case, preferring to wait for "more thorough

20  briefing from the parties on the claims that remain as trial approaches."  (9/21/20 Order at

21  5.)  Defendants believe the pre-trial picture is now sufficiently clear for the court to

22  address realignment and urge that realignment is appropriate because:  (1) they "bear the

burden of the primary causes of action," *i.e.*, their affirmative bad faith and contractual claims; (2) USF&G's declaratory judgment claims "are essentially only defenses" to Defendants' claims and were filed only in response to Defendants' IFCA notice; and (3) realignment will "promote the efficient, effective presentation of evidence at trial and avoid confusion." (Realignment Reply at 3-4.) The court agrees with Defendants that the realignment issue is now ripe for the court to consider but disagrees that realignment is appropriate.

As an initial matter, the parties disagree on the standard that should be applied. Defendants rely on *Plumtree Software, Inc. v. Datamize, LLC*, No. C 02-5693 VRW, 2003 WL 25841157, at *3 (N.D. Cal. Oct. 6, 2003), a case applying the Ninth Circuit's decision in *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867 (9th Cir. 2000), and argue that, "[i]n the Ninth Circuit, district courts look to the 'primary purpose' of the litigation to determine, in their discretion, whether to realign the parties in accordance with the primary dispute in controversy." (Realignment Mot. at 4.) USF&G contends that *Prudential*—and cases applying its "primary purpose" test, like *Plumtree*—applies only to cases where the "district court lacks subject matter jurisdiction because the parties were improperly aligned" in a manner that defeats diversity jurisdiction. (Realignment Resp. at 4 (quoting *Prudential*, 204 F.3d at 872).)

The court need not resolve this dispute, however, because even under Defendants' proposed "primary purpose" test, it finds that realignment is not justified in this case. In *Plumtree*, the court relied on several factors that are either inapplicable to this case, or counsel against realignment. For instance, the *Plumtree* court was persuaded by concerns

1   unique to the patent litigation context and the parties' joint case management statement,

2   both of which expressed a preference for the patent-holder to be the first mover in certain

3   discovery matters and first presenter at a *Markman* hearing. *See Plumtree*, 2003 WL

4   25841157, at *5. Realignment of the parties was thus "more consistent" with these other

5   aspects of the case. *Id.*

6          Additionally, although the court in *Plumtree* recognized that declaratory judgment

7   actions are "ordinarily quite appropriate" to "relieve potential defendants from the

8   Damoclean threat of impending litigation," it found that "basic rationale" inapposite

9   because the affirmative suit was filed before the declaratory judgment action. *Plumtree*,

10  2003 WL 25841157, at *4. "Thus, the 'Damoclean' threats to potential defendant

11  Plumtree [did] not exist." *Id.* Here, USF&G arguably did act to remove the threat of

12  impending litigation by seeking a declaratory judgment after receiving an IFCA notice

13  and prior to Defendants suing on their affirmative claims. That approach, as USF&G

14  notes, is encouraged under Washington law where "the facts or the law affecting

15  coverage is disputed," *Truck Ins. Exch. I*, 58 P.3d at 282 ("If in doubt, [the insurer] may

16  file a declaratory judgment action."). (Realign Resp. at 4.)

17         Finally, Defendants' argument that the parties' current alignment will cause juror

18  confusion is unavailing. (*See* Realign Mot. at 4 (quoting *Plumtree*, 2003 WL 25841157,

19  at *5).) The issues that will proceed to trial have been narrowed considerably and the

20  court is confident that any risk of juror confusion can be sufficiently mitigated and

21  managed through careful jury instruction.

22         Accordingly, Defendants' motion to realign the parties is DENIED.

1

IV.    CONCLUSION

2          For the reasons set forth above, the court:  (1) DENIES Defendants' motion to

3    realign the parties (Dkt. # 75); (2) GRANTS in part and DENIES in part USF&G's

4    motion for summary judgment (Dkt. # 70); (3) GRANTS in part and DENIES in part

5    Defendants' motion for partial summary judgment (Dkt. # 83); and (4) GRANTS in part

6    and DENIES in part Defendants' motion to seal (Dkt. # 94).

7          The Clerk is further DIRECTED to STRIKE (1) Defendants' response to

8    USF&G's motion for summary judgment (Dkts. ## 96 (sealed); 97 (redacted)) and (2)

9    Mr. Hatley's Declaration (Dkts. ## 98 (sealed); 99 (redacted)), as those filings have been

10   replaced by unredacted versions (*see* Dkt. # 112; Dkt. # 113).  To the extent Mr. Ackel's

11   redacted declaration (Dkt. # 101) contains material over which USF&G no longer asserts

12   a confidentiality interest (*see* Seal Resp. at 3), Defendants are ORDERED to file an

13   amended redacted declaration within seven (7) days of the entry of this order.

14         Dated this 12th day of January, 2022.

15

16

17                                                    JAMES L. ROBART
                                                      United States District Judge

18

19

20

21

22

ORDER - 54